STATE of Wisconsin, Plaintiff-Respondent,

v.

Jose C. MCGILL, Defendant-Appellant-Petitioner.

Supreme Court

*No. 98–1409–CR. Oral argument November 11, 1999.—Decided May 12, 2000.*

2000 WI 38

(Also reported in 609 N.W.2d 795.)

For the defendant-appellant-petitioner there were briefs and oral argument by *Steven P. Weiss*, assistant state public defender.

For the plaintiff-respondent the cause was argued by *Jennifer E. Nashold*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

¶ 1.   DIANE S. SYKES, J.   This is a challenge to a protective frisk for weapons that produced not a weapon but cocaine. The defendant, Jose C. McGill, has two complaints. First, he says there was insufficient justification for the frisk because this was merely a routine traffic stop devoid of any circumstances suggesting that he was armed and presently dangerous. And, second, he says that even if the weapons frisk was justified, the officer exceeded its scope by seizing and opening the package of cocaine that he had in his pocket. We disagree and hold that both the frisk and the subsequent seizure and inspection of the packaged drugs in McGill's pocket were constitutional.

¶ 2.   The facts are from the suppression hearing and are undisputed. On November 7, 1996, at approximately 10:10 p.m., City of Beloit Police Officer Curt Wald was on patrol in a marked squad car. As Wald drove north on Fourth Street, approaching the intersection of Fourth and Portland Avenue, he observed a maroon vehicle traveling west on Portland.

¶ 3.   The intersection of Portland and Fourth was in the early stages of construction and the westbound lane of Portland was barricaded just west of Fourth Street. Despite posted signs stating "road closed," the vehicle Wald was observing drove around the barricades using the eastbound lane and continued west on Portland.

¶ 4.   Officer Wald activated his squad car's emergency lights and pursued the vehicle down Portland.

The vehicle did not immediately stop and pull over, however, despite the fact that at the time Wald turned on his emergency lights it was only a short distance—about a block and a half—away. Instead, it proceeded down Portland for several blocks, eventually turning north onto Vine Street with Wald still in pursuit.

¶ 5.   The vehicle eventually turned into a driveway at 905 Vine Street and stopped.[1] As Wald pulled his squad behind the vehicle, he observed the driver get out of the car and walk away. Wald testified that the driver walked away from the car as if he were "trying to avoid being with that vehicle or being stopped by the police."

¶ 6.   Wald got out of his squad car and ordered the driver to stop. The driver stopped walking away and returned to where Wald was standing. Wald asked to see his driver's license. Although there were streetlights in the area, it was sufficiently dark in the driveway that Wald needed a flashlight to read the license. It identified the driver as the defendant, Jose C. McGill.

¶ 7.   Wald testified that as McGill came closer, he appeared more nervous than other people he routinely stopped on his patrol. Wald also noticed that McGill's hands were twitching and that he had the odor of intoxicants and the slight odor of marijuana on his person.

¶ 8.   Wald decided to conduct a field sobriety test on McGill; however, before doing so, he frisked McGill for weapons. Wald testified at the suppression hearing that he decided to conduct the frisk based upon a number of factors, including the fact that McGill did not stop for his lights, appeared unusually nervous, tried to

---

[1] Court documents indicate that McGill, the driver, lived in South Beloit, Illinois, not at 905 Vine Street, Beloit, Wisconsin.

walk away from the encounter, was "twitchy" and smelled of both drugs and alcohol. Wald's concerns were raised because he viewed McGill's actions as out of the ordinary. When asked what was different about McGill's actions, Wald replied:

> He didn't actually stop for my lights. He pulled into a driveway. He exited the vehicle and began to walk away from it as though he was trying to avoid being with that vehicle or being stopped by the police. . . .He twitched and acted nervous with his hands. He kept moving his hands to his pockets. Most people stay in their car and pull over immediately when they see red and blue lights flashing behind them.

¶ 9.    Wald instructed McGill to keep his hands on top of the squad car during the frisk. However, despite the order, McGill moved his hands from the hood of the squad car to his pockets several times while Wald attempted to pat him down. Wald testified that this behavior increased his concern about the contents of McGill's pockets and the potential presence of a weapon.

¶ 10.    Wald continued with the frisk until he felt a "hard oblong shaped object" in McGill's right front pants pocket. Wald testified that based on the size and shape of the object, he believed it was possibly a pocketknife. Wald asked McGill directly about the object. McGill replied that it was nothing, "just some change." The object did not feel at all like change to Wald.

¶ 11.    Wald handcuffed McGill's hands behind his back before removing the object. Wald testified that he placed McGill in handcuffs as a precautionary measure because he "didn't want to be fighting over a knife." Upon removing the object from McGill's pocket, Wald noted that it was not a knife (or change, as McGill had

claimed), but an object wrapped in aluminum foil and a plastic baggie. Based upon his training and experience (seven years as an officer), Wald believed that the item "could be any type of narcotic or drug." Wald testified that he had seen drugs packaged that way in the past.

¶ 12.  Wald opened the package. Inside the foil was a plastic baggie containing what Wald believed was powder cocaine. The powder had been packaged so tightly that it formed a hard block. Wald performed a field test on the substance and confirmed its identity. He then placed McGill under arrest for possession of cocaine.

¶ 13.  Sometime after Wald discovered the cocaine, Officer Allen Cass arrived at the scene and conducted a search of McGill's vehicle incident to arrest. On the floor behind the driver's seat, Cass discovered a rolled-up paper bag containing marijuana.

¶ 14.  McGill was charged with one count of possession of cocaine with intent to deliver as a second offender, contrary to Wis. Stat. §§ 961.41(1m)(cm)(2) and 961.48; one count of possession of THC with intent to deliver as a second offender, contrary to Wis. Stat. §§ 961.41(1m)(h)(2) and 961.48; and two tax stamp violations, contrary to Wis. Stat. §§ 139.88 and 139.89. McGill moved to suppress the drug evidence, alleging that Officer Wald discovered the cocaine on his person pursuant to an illegal search. McGill also claimed that the marijuana found in his car should be suppressed as "fruit of the poisonous tree" because the officers would not have searched his car if not for the unconstitutional search of his person, which led to the discovery of the cocaine.

¶ 15.  The Rock County Circuit Court, the Honorable James E. Welker, denied McGill's motion, finding

Wald's decision to conduct the frisk reasonable under the circumstances:

> I think you have to look at the totality of the circumstances. . .[I]n the course of that interview, he observed that this defendant who had previously tried to walk away, was moving his hands toward his pockets. And I think that that was a reasonable basis for a police officer to at least determine whether there was a weapon in that pocket before he continued with the interview.[2]

The court also found that Wald was justified in seizing and opening the foil-wrapped package in McGill's pocket.

¶ 16.   McGill pled guilty to a reduced charge of simple possession of cocaine as a second offense and possession of THC with intent to deliver as a second offense. He was sentenced to a total of 12 years in state prison. McGill appealed, and the court of appeals, in an unpublished opinion, affirmed.

■

¶ 17.   We turn first to the permissibility of the frisk under the Fourth Amendment. In reviewing the denial of a motion to suppress evidence, we will uphold the circuit court's findings of fact unless they are against the great weight and clear preponderance of

---

[2] The circuit court apparently concluded that McGill moved his hands towards his pockets before Wald began the frisk, and considered this movement as one circumstance justifying the frisk. Although the record clearly shows that McGill reached for his pockets during the pat-down, it is not clear from the record whether McGill also did so before Wald's initial decision to conduct the frisk. Consequently, we do not rely on this fact as a justification for Wald's decision to conduct the frisk, although it is a significant factor justifying Wald's determination to seize the object from McGill's pocket.

the evidence. *State v. Williamson*, 113 Wis. 2d 389, 401, 335 N.W.2d 814 (1983). We then independently review those facts to determine whether the constitutional requirement of reasonableness is satisfied. *Id.*

¶ 18.  The Fourth Amendment prohibits unreasonable searches and seizures. Courts make the determination of whether a search is reasonable by balancing the government's need to conduct the search against the invasion the search entails. *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

¶ 19.  In *Terry*, the United States Supreme Court struck a balance between the need for law enforcement officers to protect themselves from harm and the individual's right to personal security. *Id.* at 23–25. The Court recognized the dangers faced by the police when conducting close-range investigations of suspects. *Id.* at 23–24. It concluded that the "more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him" justifies the limited intrusion on individual rights that the protective frisk entails. *Id.* Where an officer reasonably believes that his safety may be in danger because the suspect he is investigating may be armed, it would be unreasonable not to allow him to conduct a limited search for weapons. *Id.* at 24.

¶ 20.  The need for officers to frisk for weapons is even more compelling today than it was at the time of *Terry*. In 1966, 57 law enforcement officers were feloniously killed in the line of duty and 23,851 officers were assaulted. *Terry*, 392 U.S. at 24 n.21. Although the number of officers killed in the line of duty has increased only slightly (61 officers killed in 1998), the number of assaults on officers has more than doubled

(59,545 line-of-duty assaults in 1998). Federal Bureau of Investigation, Department of Justice, *Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted (1998)* 8, 84 (1999). The vast majority of these assaults, approximately two-thirds, took place during the evening and early-morning shifts, between 6 p.m. and 4 a.m. *Id.* at 10, 85. Thus, the justification for protective frisks is as vital today as it was at the time the Court decided *Terry*.

¶ 21.    *Terry* does not, however, authorize officers to conduct a protective frisk as a part of every investigative encounter. Rather, *Terry* limits the protective frisk to situations in which the officer is "justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *Terry*, 392 U.S. at 24. Specifically, the Court held:

> [W]here a police officer observes *unusual conduct which leads him reasonably to conclude in light of his experience* that criminal activity *may be* afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment. . . .

*Id.* at 30–31 (emphasis added).

¶ 22.   Based upon *Terry*, this court has held that protective frisks are justified when an officer "has a reasonable suspicion that a suspect may be armed." *State v. Morgan*, 197 Wis. 2d 200, 209, 539 N.W.2d 887 (1995)(citing *State v. Guy*, 172 Wis. 2d 86, 94, 492 N.W.2d 311 (1992), *cert. denied*, 509 U.S. 914 (1993)). The "reasonable suspicion" must be based upon "specific and articulable facts," which, taken together with any rational inferences that may be drawn from those facts, must establish that the intrusion was reasonable. *State v. Richardson*, 156 Wis. 2d 128, 139, 456 N.W.2d 830 (1990)(citing *Terry*, 392 U.S. at 27).

¶ 23.   The reasonableness of a protective frisk is determined based upon an objective standard. That standard is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety and that of others was in danger." *Terry*, 392 U.S. at 27. We apply this standard in light of the "totality of the circumstances." *Richardson*, 156 Wis. 2d at 139–40.

¶ 24.   McGill argues that this record lacks any "specific or articulable facts" to demonstrate that Wald reasonably suspected that McGill was armed and dangerous. To the contrary, the record establishes a number of very specific facts that support such a suspicion, although not all were relied upon by the officer as a part of his subjective analysis of the situation. But as we have stated, this is an objective test, and therefore certain factors, such as the time of night and the fact that the officer was alone, can and should be part of the equation. *Terry*'s requirement that the facts supporting the frisk be "articulable" means that they must be concrete rather than speculative, in order to avoid

searches based upon the proverbial "hunch." It does not amount to a requirement that the court restrict its reasonableness analysis to the factors the officer testifies to having subjectively weighed in his ultimate decision to conduct the frisk. *Terry* said "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21–22. We may look to any fact in the record, as long as it was known to the officer at the time he conducted the frisk and is otherwise supported by his testimony at the suppression hearing.

¶ 25.    This is consistent with a number of similar cases from this court assessing the reasonableness of protective frisks. In *Morgan*, 197 Wis. 2d at 204, two officers on patrol at 4 a.m. in what was described as a "fairly high-crime area" observed a car driving in and out of an alley. The car had expired license plates, and the officers pulled it over. *Id.* The driver was unable to produce his license and appeared nervous. *Id.* We upheld the officers' decision to frisk the driver based upon the totality of these facts. *Id.* at 215.

¶ 26.    Also, in *Williamson*, 113 Wis. 2d at 391, two officers writing out tickets in their parked squad car observed two men in a yard. The men appeared startled to see the officers and one, the defendant, began staring at the squad car. *Id.* At the suppression hearing the officer described several additional factors that led to the frisk, including the fact that the incident occurred at 2 a.m. and visibility was poor, the defendant turned away so that the officer could no longer see his hands, and the defendant was in the company of a man who admitted he was wanted and had previously

been convicted for carrying a concealed weapon. *Id.* at 393. Based upon these facts, and all reasonable inferences that could be drawn from them, we determined that the officer reasonably concluded that the defendant might have been carrying a weapon. *Id.* at 402.

¶ 27.   The facts known to Officer Wald in this case are arguably more compelling than the facts known to the officers in *Morgan* and *Williamson*. Here, Wald initially attempted to perform a routine traffic stop, but McGill resisted. Rather than pulling to the side of the road, as most drivers do when they see red and blue police lights behind them, McGill continued down the barricaded street, turned the corner, and parked in a private driveway. Wald stated that he had conducted over 1,000 traffic stops and the majority of people stopped their cars immediately.

¶ 28.   Once his car was stopped, McGill did not remain in the driver's seat and wait for the officer to approach (as most people do, according to Wald's testimony), but, rather, got out of the car and began walking away. It is reasonable to infer, as Officer Wald did, that McGill was trying to avoid the encounter.

¶ 29.   When McGill finally did submit to the field investigation, Wald noted that he was unusually nervous—beyond the level of nervousness that the officer normally observed in individuals he stopped. McGill argues that Wald's decision to conduct the frisk was made solely on the basis of his nervousness and that nervousness alone does not justify a protective frisk under *United States v. Wood*, 106 F.3d 942 (10th Cir. 1997). In Wisconsin, however, a suspect's overt nervousness *is* a legitimate factor to consider in determining whether a protective frisk was justified, *Morgan*, 197 Wis. 2d at 213, 215, and there is no basis

in this record to suggest that McGill's nervousness was the *only* factor present to justify this search.

¶ 30.   McGill also points to the fact that Wald summoned him over to his squad car to support his contention that the officer cannot have reasonably suspected the presence of a weapon. Why would the officer put himself in close proximity to someone he thought might be armed (so the argument goes)? But this totally misses the mark. Police officers are subjected to risky situations every day; that they are called upon to initiate field investigations involving close face-to-face contact with persons whom they suspect might be armed should come as no surprise. The whole point of the *Terry* frisk is to allow the officer in this situation to protect himself or herself. It turns *Terry* on its head to argue, as the defendant does here, that the officer cannot possibly have been concerned about the presence of a weapon if he initiated close proximity with the suspect in the first place.

¶ 31.   In addition to noting McGill's out-of-the-ordinary nervousness, Wald also noted that he smelled of intoxicants and illegal drugs. It is logical and completely reasonable to infer that a person under the influence may be more likely to commit an impulsive violent act against a police officer than one who is sober.[3] Wald also testified that the defendant

---

[3] The dissent is concerned that we have established in this case a per se rule that "police officers may infer that anyone who has an odor of intoxicants or marijuana is armed and presently dangerous and may be frisked." Dissent at ¶ 56. We have not. The odor of intoxicants and marijuana (and the common sense inference that the defendant was under the influence and therefore potentially more dangerous to the officer) represents only one piece of the total factual picture here and therefore only part of the constitutional justification for this frisk.

"twitched and acted nervous with his hands." This fact in particular justified the officer's suspicions about the presence of a weapon and supports the reasonableness of the frisk.

■

¶ 32.  Finally, we also consider the overall circumstances of the stop. *Morgan*, 197 Wis. 2d at 212–13. In this case, the stop occurred after 10 p.m. in a dark driveway. We have consistently upheld protective frisks that occur in the evening hours, recognizing that at night, an officer's visibility is reduced by darkness and there are fewer people on the street to observe the encounter. *Id.* at 214; *See also State v. Flynn*, 92 Wis. 2d 427, 435, 285 N.W.2d 710 (1979), *cert. denied*, 449 U.S. 846 (1980); *Richardson*, 156 Wis. 2d at 144. As we have already noted, most assaults on police officers occur during the evening or nighttime hours. We also note that unlike the officers in *Morgan* and *Williamson*, Wald was alone with McGill and had no back-up, making him more vulnerable.

¶ 33.  Wald found himself alone at night in a dark driveway with a suspect who was demonstrating unusual behavior—failure to stop, an attempt to walk away and avoid the encounter (as if he had something—perhaps a weapon—to hide), nervousness beyond that exhibited by most traffic suspects, hand twitches and apparent alcohol and drug intoxication. This is not behavior associated with a "routine traffic stop," as the defendant argues this was. A reasonably prudent officer in possession of these facts would be warranted in the belief that his suspect may be armed and presently dangerous. We find that the protective frisk was reasonable.

¶ 34.  We now turn to the issue of whether Wald exceeded the limited scope of the *Terry* frisk when he

574

removed the foil-wrapped package of cocaine from McGill's pocket and opened it. Protective frisks under *Terry* must be confined in scope "to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. McGill argues that Wald exceeded that scope because the object that the officer felt in his pocket could not possibly have been a weapon and that the officer never stated that he actually believed it was a weapon.

¶ 35. *Terry* has never been interpreted to impose a subjective requirement that the officer conducting the search be *convinced* that the object he detects on the suspect's person is a weapon before he may legally seize it. All that is required is a *reasonable belief* that the object might be a weapon. *Williamson*, 113 Wis. 2d at 403; 4 Wayne R. LaFave, *Search and Seizure* § 9.5(c), at 276–77 (3d ed. 1996).

¶ 36. Here, the size, shape and feel of the object the officer felt in the defendant's pocket were consistent with its being a pocketknife. Wald described it as a hard, oblong object between two to four and one-half inches long. He said he thought the object "could have been a pocket knife." Although the object turned out to be packaged cocaine instead, Wald testified that it was so compacted that it felt like a hard, solid object.

¶ 37. In addition, when Wald felt the object in McGill's pocket and asked him what it was, McGill lied to him, saying it was "just change." It was clear to Wald from the object's size and shape that it was *not* change. Finally, during the course of the frisk, McGill kept reaching for his pockets, despite being told by the officer not to. McGill's attempt to deceive Wald as to his pocket's contents, combined with his twitchy hand

movements and his general nervousness, reinforced the officer's reasonable belief that the defendant was concealing something, perhaps a weapon, in that pocket. The seizure of the object from the defendant's pocket was justified.

¶ 38. The fact that Wald handcuffed McGill before removing the object does not render the search illegal. In *State v. Guy*, 172 Wis. 2d at 96, we upheld a frisk performed while a suspect was in handcuffs. An officer may place a suspect in restraints in order to protect himself during a *Terry* frisk. *See generally United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). Here, McGill did not cooperate with Wald's commands to keep his hands on the squad car, but continually reached for his pockets instead, increasing the officer's concerns. "I didn't want to be fighting over a knife," Officer Wald testified. Under these circumstances, the use of handcuffs to restrain the defendant during the frisk was a reasonable measure to ensure the officer's safety.

¶ 39. In *Terry* itself, and several subsequent cases, the United States Supreme Court has explicitly recognized the need for an officer to pursue his investigation without the fear of violence. *See Adams v. Williams*, 407 U.S. 143 (1972). It makes no sense to require an officer to cease a *Terry* frisk simply because he or she has found it necessary to place the individual he or she is searching in handcuffs. If the officer ultimately finds no probable cause to arrest and releases the suspect, he remains at risk of an armed assault because he has not removed the threat by completing the protective frisk. *Guy*, 172 Wis. 2d at 96; 4 Wayne R. LaFave, *Search and Seizure* § 9.5(a), at 252–53 (3d ed. 1996). Police officers do not need to choose between

576

completing a protective frisk and handcuffing a suspect in a field investigation. They may do both, if the circumstances reasonably warrant it, as they clearly did in this case.

¶ 40. Once Officer Wald removed the object from McGill's pocket, it became apparent that it was not in fact a knife, but was a small package wrapped in aluminum foil. McGill argues that Wald illegally opened the package. McGill is incorrect. An officer may inspect an object seized in a *Terry* frisk when it is immediately apparent that the object is, or contains, contraband. *See Guy*, 172 Wis. 2d at 101. While a *Terry* frisk is not a general evidentiary search, an officer is not required to look the other way when he inadvertently discovers evidence of a crime during the course of a legitimate protective frisk. *Richardson*, 156 Wis. 2d at 150; *State v. Washington*, 134 Wis. 2d 108, 123, 396 N.W.2d 156 (1986). Seizure and inspection of evidence without a warrant is justified when the officer is lawfully in a position to observe the evidence, the evidence is in plain view of the officer, the discovery is inadvertent, and "[t]he item seized in itself or in itself with facts known to the officer at the time of the seizure, provides probable cause to believe there is a connection between the evidence and criminal activity." *Washington*, 134 Wis. 2d at 121 (quoting *Bies v. State*, 76 Wis. 2d 457, 464, 251 N.W.2d 461 (1977)). *See also* 4 Wayne R. LaFave, *Search and Seizure*, § 9.5(d), at 283 (3d ed. 1996)(if stop and frisk is lawful, then seizure of evidence of a crime on probable cause is fully justified).

¶ 41. This was a lawful protective frisk, and the officer discovered the foil-wrapped package inadvertently, in the reasonable belief that it might be a

weapon. The only remaining question is whether Wald had probable cause to believe that the package contained evidence of a crime—in this case, drugs. Probable cause only requires that the facts available to the officer would " 'warrant a [person] of reasonable caution in [the] belief,' that certain items may be contraband." *Texas v. Brown*, 460 U.S. 730, 742 (1983)(quoted sources and citations omitted).

¶ 42.    In determining whether probable cause exists, we may consider the officer's previous experience, *State v. DeSmidt*, 155 Wis. 2d 119, 134–35, 454 N.W.2d 780 (1990), and also the inferences that the officer draws from that experience and the surrounding circumstances. *State v. Pozo*, 198 Wis. 2d 705, 713, 544 N.W.2d 228 (Ct. App. 1995). Officer Wald testified that the object he removed from McGill's pocket was an object wrapped in aluminum foil and a plastic baggie, and that he knew illegal drugs were packaged in this way. In addition, McGill smelled of intoxicants and marijuana. He kept reaching for the pocket with the package during the course of the frisk and he lied about its contents. Under these circumstances, there was probable cause to open and inspect the foil-wrapped package lawfully seized from McGill's pocket.

¶ 43.    We conclude, therefore, that Wald's frisk of McGill was based upon specific, articulable facts leading the officer to reasonably believe that the defendant might be armed. The seizure of the object discovered during the frisk was based upon a reasonable belief that it was a knife. The inspection of the foil-wrapped package removed from McGill's pocket was based upon probable cause that the item contained contraband. Accordingly, the search, seizure, and inspection of the

evidence seized in this case were reasonable and fully consistent with the Fourth Amendment.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 44.  SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting)*. Police safety is of paramount importance in Fourth Amendment jurisprudence. Every person whom a law enforcement officer stops presents a risk to the officer. Perhaps police officers should be allowed to frisk anyone and everyone stopped for a violation of the law. But in our country police officers do not have this power. Police officers are not authorized under the federal constitution to frisk every person they stop.[1]

¶ 45.  In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court made the limits on frisking clear. The court began by recognizing the importance of individual freedom from government restraint, stating:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. *Terry*, 392 U.S. at 9 (internal quotation marks and citation omitted).

---

[1] "The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *Sibron v. New York*, 392 U.S. 40, 64 (1968).

¶ 46.  *Terry* went on to hold that an officer may perform a limited frisk "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *Terry*, 392 U.S. at 24. The *Terry* exception to the probable cause requirement has a "narrow scope." *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979).

¶ 47.  *Terry* requires "reasonable, individualized suspicion" that the person is armed and dangerous before undertaking a frisk; the officer must point to specific and articulable facts that would warrant a reasonably cautious officer in light of his or her experience to believe that the defendant was armed. *Terry* frisk cases are fact-sensitive. The necessary articulable facts are, in my opinion, missing in this case.

¶ 48.  I conclude that the officer acted on an "inchoate and unparticularized suspicion or 'hunch.' " *Terry*, 392 U.S. at 27. The hunch here did not prove correct. The defendant was not armed. That fact is not relevant in determining the constitutionality of the frisk.

¶ 49.  The facts relied on by the majority were articulated by the officer. The court may draw reasonable inferences from those articulated facts. The officer's decision to frisk the defendant should be judged on whether the facts articulated by the officer, and facts reasonably inferred, were sufficient to justify the officer's suspicion that the defendant was armed and presently dangerous. In my view, this standard is not met here.

¶ 50.  The stop occurred at night, it was dark, and the officer was alone. The officer frisked the defendant "because he didn't stop right away, smell of intoxicants. He was acting nervous, his hands were twitching by his

sides. For my safety and his safety I decided I should pat him down before I continued any further. Was going to do a field sobriety test."

¶ 51.    These facts simply do not add up to a reasonable belief that the defendant was armed and presented a danger to the officer.

¶ 52.    The majority opinion infers from the facts, including that the defendant was attempting to walk away from the officer and avoid the encounter, that the defendant had something to hide. The majority opinion then infers from the "attempt to hide something" that the something was "perhaps a weapon." *See* majority op. at ¶ 33. The majority's inference that the defendant was attempting to hide a weapon is not based on any articulated fact. The officer in this case may have indeed reasonably suspected that the defendant had something to hide. But that suspicion does not justify a *Terry* frisk for a weapon.

¶ 53.    A *Terry* frisk is not to see if the defendant is hiding something that may be evidence of illegal activity. As the U.S. Supreme Court has made clear, "[n]othing in Terry can be understood to allow a generalized cursory search for weapons or, indeed, any search whatever for anything but weapons." *Ybarra v. Illinois*, 444 U.S. 85, 93–94 (1979) (internal quotation marks omitted).

¶ 54.    An officer may not conduct a *Terry* frisk unless the officer has reasonable suspicion that the defendant is armed and presently dangerous. No facts justifying such a reasonable suspicion are articulated or may be inferred in this case.

¶ 55.    The majority opinion also errs in relying on the fact that the defendant "smelled of intoxicants and illegal drugs [marijuana]." Majority op. at ¶ 31. The officer testified that the defendant had an "odor of

intoxicants and a slight odor of marijuana." The majority jumps from the officer's statement about what he smelled to conclude that the defendant "was under the influence" and not sober. Majority op. at ¶ 31. From there the majority opinion further declares that a person who is not sober is more likely to commit an impulsive violent act than one who is sober. Majority op. at ¶ 31. The majority opinion thus infers facts that are not rationally related to the officer's observation that the defendant had an odor of intoxicants and a slight odor of marijuana.

¶ 56.    The U.S. Supreme Court has clearly told us that we cannot adopt per se rules in search and seizure cases based on the fact that many involved with illegal drugs carry weapons. *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). The majority opinion suggests that police officers may infer that anyone who has an odor of intoxicants or marijuana is armed and presently dangerous and may be frisked. I disagree.[2]

---

[2] In *Richards v. Wisconsin*, 520 U.S. 385, 394–95 (1997), the U.S. Supreme Court overturned this court's blanket generalization that all drug dealers may be presumed armed and that therefore no-knock entries to the home are justified. The U.S. Supreme Court condemned this court's categorical rule on the grounds that the generalization could be applied to many crimes and thus undercut the Fourth Amendment requirement of individualized suspicion. *Richards*, 520 U.S. at 394. I believe the same concern applies to the suggestion in this case that all persons who smell of intoxicants can be frisked for weapons.

On this issue *see State v. Thomas*, 542 A.2d 912, 916–18 (N.J. 1988) (where officer was investigating report that defendant was in possession of narcotics, nothing in record justified officer in frisking the defendant); *State v. Cobbs*, 711 P.2d 900, 907 (N.M. Ct. App. 1985) ("In order, however, to conduct a frisk of a person suspected of engaging in a non-violent offense, such as possession of small amounts of marijuana, vagrancy, or pos-

¶ 57. My decision rests, as does the U.S. Supreme Court's *Terry* opinion, and as the majority opinion does not, on a recognition that subjecting an individual to being frisked is not a small invasion of privacy. The *Terry* Court viewed a frisk as "a severe, though brief, intrusion upon cherished personal security," an "annoying, frightening, and perhaps humiliating experience." *Terry*, 392 U.S. at 24–25. The court further described the "stop and frisk" as "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry*, 392 U.S. at 24–25.[3]

¶ 58. I agree with Judge Friendly that "courts should not set the test of sufficient suspicion that the individual is 'armed and presently dangerous' too high when protection of the investigating officer is at stake." *United States v. Riggs*, 474 F.2d 699, 705 (2d Cir. 1973). With this in mind, I conclude that this record does not establish a basis for an objectively reasonable belief that the defendant was armed and dangerous.

---

session of liquor, additional articulable facts of potential danger must be present, as well as the suspicion of criminal activity.").

[3] Today's decision affects not only this individual defendant, but all of us. I quote from Justice Stevens:

> ... the potential daily burden on thousands of innocent citizens is obvious. That burden may well be minimal in individual cases. But countless citizens who cherish individual liberty and are offended, embarrassed, and sometimes provoked by arbitrary official commands may well consider the burden to be significant. In all events, the aggregation of thousands upon thousands of petty indignities has an impact on freedom that I would characterize as substantial, and which in my view clearly outweighs the evanescent safety concerns pressed by the majority.

*Maryland v. Wilson*, 519 U.S. 408, 419 (1997) (Stevens, J., dissenting) (internal quotation marks omitted).

¶ 59. Because the frisk was conducted in violation of the Wisconsin and U.S. constitutions, the evidence found by the subsequent seizure and search of the contents of the plastic bag must be suppressed. Alternatively, even if the *Terry* frisk were justified, I conclude that the officer did not have probable cause to open the plastic bag and unwrap the aluminum foil that he had seized from the defendant's pocket.

¶ 60. The majority recognizes that the officer's decision to open and unwrap the plastic bag cannot be justified as a *Terry* search. *See* majority op. at ¶ 40. After removing the plastic bag from the defendant's pocket, the officer knew that the plastic bag was not a weapon. The *Terry* frisk was therefore completed.[4]

¶ 61. The majority nonetheless upholds the officer's decision to open the plastic bag and unwrap the aluminum foil, stating that the object was in plain view of the officer and he had probable cause to believe that it contained illegal drugs. *See* majority op. at ¶ 42.

¶ 62. The majority opinion reasons as follows: the officer had seen drugs in other cases packaged in aluminum foil within a plastic bag, the defendant smelled of intoxicants and marijuana, the defendant lied about the contents of the plastic bag, and the defendant reached for his pocket while the officer was frisking him. *See* majority op. at ¶ 42.

¶ 63. The officer's testimony in this case is revealing. The officer testified at the suppression hearing that when he saw the object he thought it "could be any type of narcotic or drug." Majority op. at ¶ 11. He

[4] *See Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993):

If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed (internal quotation marks and citation omitted).

further stated that he did not know what was in the foil until he opened it. The words "could be" and "did not know" are not those of probable cause or immediate apparency.[5] Regarding the officer's experience with drugs packaged this way, he testified he had seen such packaging "less than" 10 times during a seven-year career.

¶ 64.   This case is similar to *Davis v. State*, 829 S.W.2d 218, 220–21 (Tx. Ct. Crim. App. 1992), in which an officer, during a legal *Terry* stop of a suspected drug dealer, seized and opened a box of matches that contained drugs. The court concluded that the officer had proper grounds to remove the matchbox from the defendant's pocket to see if it was a weapon. However, even though the officer was investigating a possible narcotics sale and testified that he had seen drugs kept in matchboxes previously, the court held that the officer's testimony could not justify the search under the "plain view" doctrine. The court suppressed the evidence. 829 S.W.2d at 221 and n.5.

¶ 65.   The facts of this case are very similar to those in *Davis*. The incriminating character of the object was not immediately apparent to the officer. The

---

[5] *See State v. Paul T.*, 993 P.2d 74, 83 (N.M. 1999). In that case, the New Mexico Supreme Court held that although the officer had grounds to conduct a *Terry* frisk on a juvenile he was transporting, the officer exceeded the "plain feel" doctrine when he removed a plastic bag from the defendant's pocket. The court stated:

Finally, the State appears to make a sub-argument under *Terry* and its progeny regarding the "plain feel" doctrine, which embraces soft objects. . . .Even if we were to reach the issue of "plain feel," the fact that Officer Serna merely speculated about what the object in Paul's pocket "could have been" indicates that it was not immediately apparent to him that the object was in fact contraband. This argument is therefore unavailing.

object that was just a second ago thought to be a weapon, now "could have been" drugs. Such testimony does not equal the probable cause required, unless every opaque container in the pocket of every suspect can be presumed to contain contraband. Such a presumption, such a per se rule, is inconsistent with the constitutional protection against unreasonable search and seizure.

¶ 66. For the reasons stated, I dissent.