# COURT OF APPEALS
## DECISION
## DATED AND FILED

## June 27, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1362-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF3952

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

MARIO EARL SMITH,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: FREDERICK C. ROSA and DANIELLE L. SHELTON, Judges. *Affirmed*.

Before Brash, C.J., Donald, P.J., and Dugan, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Mario Earl Smith appeals from a judgment of conviction for possession with intent to deliver cocaine, with use of a dangerous weapon and as a second or subsequent offense, and felon in possession of a firearm.  He also appeals from an order of the circuit court denying his postconviction motion alleging ineffective assistance of counsel.[1]

¶2     On appeal, Smith argues that he received ineffective assistance of counsel related to his motion to suppress, and he contends that trial counsel was ineffective for failing to call him as a witness at the hearing on the motion to suppress and failing to adequately cross-examine the officer that conducted the stop and subsequent search.  Upon review, we conclude that trial counsel was not ineffective, and therefore, we affirm.

## BACKGROUND

¶3     The State charged Smith with one count of possession with intent to deliver cocaine with use of a dangerous weapon, as a second or subsequent offense, one count of possession of a firearm by a felon, and one count of possession of narcotic drugs with use of a dangerous weapon, as a second or subsequent offense.

¶4     Smith filed a motion to suppress, alleging that he was illegally stopped and searched the morning of August 24, 2017, by Officer Jedidiah Thompson.  The circuit court held a hearing on Smith's motion at which Officer

---

[1] The Honorable Frederick C. Rosa presided over Smith's motion to suppress and entered the judgment of conviction.  The Honorable Danielle L. Shelton presided over the postconviction proceedings and entered the order denying Smith's postconviction motion.  We refer to Judge Rosa as the circuit court and Judge Shelton as the postconviction court.

Thompson testified to the stop and search he conducted, and his body camera footage was played.

¶5 Officer Thompson testified that he received a dispatch at approximately 4:20 a.m. on the morning of August 24, 2017, stating that multiple subjects had been spotted searching through a vehicle and fleeing "eastbound on Oklahoma from 23rd Street" in a dark colored SUV. At the time of the dispatch, Officer Thompson was on 11th Street near West Oklahoma Avenue. He believed that he was in a position to intercept the SUV and began driving westbound on West Oklahoma Avenue. He then spotted a dark colored SUV driving eastbound on West Oklahoma Avenue. There were no other dark colored SUVs "that matched the description if any at all" and traffic was "very, very light." Officer Thompson testified that he believed the SUV he saw was the SUV described in the dispatch—he based that conclusion on four factors: (1) the suspect vehicle was a dark colored SUV; (2) it was traveling "eastbound on Oklahoma from 23rd Street"; (3) he was traveling westbound on Oklahoma from 11th Street; and (4) he did not see any other dark colored SUVs, he believed that the SUV he saw was the SUV described in the dispatch.

¶6 Officer Thompson testified that he started following the SUV, ran a license plate check for the SUV, and activated the lights on his squad car. The SUV did not pull over immediately. It continued driving slowly for over a block, made a turn, and then pulled into the front yard of a residence. Officer Thompson testified that he could not see into the SUV during this time because the windows were tinted. He pulled into the alley next to the yard. Officer Thompson explained further that he prepared to conduct a "high risk traffic stop" for several reasons—namely, he was alone, the dispatch reported that there were multiple

3

subjects in the SUV, and he was unable to see inside the vehicle due to the dark tint of the windows.

¶7    Officer Thompson further testified that the driver exited the SUV, and he ordered the driver to stop. He explained that the driver was standing in between his squad and the SUV with the driver's side door open. He then stated that "[The driver] was looking back at [him]. [The driver] then … started reaching towards the front driver's seat near the floorboards." Officer Thompson testified that he ordered the driver to stop reaching into the SUV and that "[the driver] then complied with [his] orders to turn around and [Officer Thompson] approached him." At that time, Officer Thompson was concerned about what the driver was reaching for because he "did not know what he was reaching towards," but he knew it was "quite common for people to carry firearms in a vehicle, to have the firearm placed there." He also testified that when the driver got out of the SUV, he did not know if anyone else was in the SUV because the windows were tinted.

¶8    Officer Thompson then asked the driver if he had anything in his possession that "he wasn't supposed to have" and the driver responded that "he didn't know."[2] Officer Thompson testified that he then approached the driver and conducted a pat-down search for weapons:

> Because [the driver's] answer was evasive saying he didn't know [what] he was supposed to have, because of the fact that I was alone, the fact that he couldn't answer if he had anything on that he wasn't suppose[d] to have, was being evasive about that and the time of day and then I was alone

---

[2] On cross-examination, Officer Thompson stated that Smith did eventually reply that he had money on him and that Smith told Officer Thompson that he was "on paper," which meant Smith was under supervision. Further, when counsel asked him if he was aware that "some people on probation … aren't allowed to have certain amounts of currency on them," Officer Thompson said he was aware of that.

and feared if he had any weapons on him they could have been used against me.

¶9    Officer Thompson testified that during the pat-down, "he focused along [the driver's] waistband and places where people commonly carry weapons." He stated that he felt a large lump in the driver's waistband that he believed to be a plastic bag of potential contraband. He testified that "it felt like a large lump that appeared to be a plastic bag containing smaller lumps that I immediately recognized as common street packaging for crack cocaine sales." When Officer Thompson removed the bag, it appeared to contain crack cocaine.[3]

¶10    On cross-examination, Officer Thompson acknowledged that he was mistaken about the dispatch because the corresponding CAD report[4] indicated that the dispatch referred to the 2300 block of East Oklahoma Avenue, not West Oklahoma Avenue. However, Officer Thompson was on 11th Street near West Oklahoma Avenue, and therefore, Officer Thompson was approximately forty-six blocks from the actual call. Thus, when Officer Thompson began driving westbound on West Oklahoma Avenue, he was, in fact, driving away from the SUV identified in the dispatch. However, Officer Thompson testified that until trial counsel showed him a copy of the CAD report during cross examination, he believed that he was responding to a call from 2300 West Oklahoma not East Oklahoma. Further, he testified that "Like I said, when you just had me read that address that was the first time I realized that [the] initial call came from East

---

[3] In addition to crack cocaine, Officer Thompson also recovered a powdery substance he believed to be either powdered cocaine or heroin, a firearm under the driver's seat, pills that were thought to be ecstasy pills, and three cellphones.

[4] Officer Thompson also testified that a CAD, or computer aided dispatch, is a document that contains information such as the location of the police call, which police agency is assigned to respond, and a description of the issue.

Oklahoma." Officer Thompson testified that he believed—albeit mistakenly—that he was intercepting the vehicle described in the dispatch and that he further stopped the vehicle because the license plates on the vehicle were not registered to it.

¶11 The circuit court denied Smith's motion. In an oral ruling, the circuit court stated, "[I]t's pretty clear the officer went to the wrong location, pretty clear that he was mistaken[.]" However, the court further stated that

> It does appear that all the testimony the officer gave on direct was consistent with responding to 23rd and West Oklahoma, and he seemed very genuinely surprised when defense pointed out that he, in fact, had gone to the wrong location and had missed it by quite a few blocks. But it appears does appear to me that on the witness stand is the first time that he recognized that he made a mistake.

In other words, the circuit court found that Officer Thompson was credible in his testimony.

¶12 The circuit court then applied the good faith exception to the officer's mistake saying, "[W]hat the [c]ourt is required to look at here is what is the belief that the officer was acting under and whether that was reasonable under the circumstances[.]" The court continued:

> In terms of the stop, the information the officer had was that it was a vehicle involved in essentially breaking into other vehicles. That vehicle had multiple individuals. Mr. Smith's did not. But the testimony here is that the officer could not see into the vehicle and determine how many occupants were in there.…
>
> ... [I]t was subjects breaking into a vehicle, it was dark, it was 4:00 in the morning, the traffic was light, and the officer went on a path where he could reasonably be expected to intercept the vehicle described on dispatch. And unfortunately for Mr. Smith, he just happened to be coming along at that time and his vehicle fit the general

description. So I think that the officer had reasonable suspicion.

As to the search, the circuit court stated:

> In terms of the stop, given what the officer knew at the time, it's not unreasonable to conduct a pat-down for weapons. In terms of the pat-down, he patted the outer clothing. Mr. Smith had on shorts and a shirt at that time, and he could feel the contraband in the waistband, and that was an area that he patted down. He's entitled to look for weapons. So I don't think that the search was excessive given the totality of the circumstances.

¶13     Smith subsequently pled guilty to one count of possession with intent to deliver cocaine and one count of felon in possession of a firearm, and he was sentenced to a total of thirteen years and six months of imprisonment, composed of seven years and six months of initial confinement and six years of extended supervision.

¶14     Smith filed a motion for postconviction relief, in which he argued that he received ineffective assistance of counsel related to his motion to suppress. Specifically, he argued that trial counsel was ineffective for failing to elicit certain evidence through further examination of Officer Thompson and by failing to call Smith to testify. Smith alleged that trial counsel should have elicited the following facts: (1) that Officer Thompson had an opportunity to see that Smith was the only occupant in his SUV when Smith rolled down all the windows, when Smith went through a well-lit intersection, and when Officer Thompson shined a bright light into Smith's vehicle; and (2) that Smith's motion with his right hand when he exited his vehicle was nothing more than him tossing his car keys onto the driver's seat, as opposed to any sort of furtive movement as Officer Thompson described.

¶15    The postconviction court held a ***Machner***[5] hearing, at which trial counsel, Smith, and Officer Thompson testified. Trial counsel testified that her general strategy in support of the motion to suppress was "to show that the vehicle that [Officer Thompson] saw—which ended up including Mr. Smith—was not the vehicle that was consistent with that dispatch that he had received." She further testified that she did not call Smith to testify about any additional information because it "probably wouldn't make that much of a difference because the issue was more what was the officer's perspective at the time of initiating the stop." She also explained:

> [I]n cross examining the officer, we were able to establish that the officer's belief that this vehicle was the vehicle in question could not have been the vehicle. And so by getting that out in cross from the officer, we thought that would give us enough of a reason to be able to argue that his version of the events weren't credible as it is. So we didn't think that Mr. Smith's testimony would add much, balanced against what my understanding was as his desire to not testify as well.

¶16    Smith testified that he told trial counsel "verbally about some stuff that [he] thought was important," and he wanted to testify at the suppression hearing to point out some of those things.[6] Smith then continued by testifying to his version of events from the morning of August, 24, 2017. Specifically, Smith stated that "the first thing" he did when he saw Officer Thompson was to "roll[] all [his] windows down." He also testified that he rolled his windows back up "right after I passed him." He then testified that "[w]hen we pass the intersection I

---

[5] ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[6] As we note above, that trial counsel testified that Smith told her that he did not want to testify.

rolled the back ones back up. My driver['s side] always stay[s] down." He also testified that he did not pull over immediately upon seeing Officer Thompson's lights because there was no place to pull over, he complied with all of Officer Thompson's commands at the time of the stop, and the gesture that Officer Thompson testified about was actually him throwing his keys on the front seat of his car. Smith also testified that he was not "trying to hide information" from Officer Thompson by giving what Officer Thompson described as an "evasive" answer. Rather, Smith testified that he simply could not remember the amount of money that he was allowed to have on him, so he was not sure if the amount of money that he had at the time violated "[his] rules."

¶17 Overall, Smith testified that "once it was over, [he] had some extra questions [he] had wanted … to ask that [he] felt had been missed." Specifically, he testified that he tried to communicate his concerns to trial counsel prior to the conclusion of the hearing and that he would have been willing to testify to those missed questions at the suppression hearing, if trial counsel told him that he was able to change his mind about testifying. In response to postconviction counsel's question, "Did you want to testify?" Smith responded, "To the point about the keys. I did." Counsel then asked, "So at that point you were asking your attorney how you could get more information about your hands and the movements?" Smith answered, "Something like that." Smith said that he wanted to establish that the gesture that he made towards the SUV was simply throwing the keys into the SUV.

¶18 The postconviction court denied Smith's motion. In a written decision, the postconviction court stated, "No other person can testify as to what Officer Thompson observed or knew after he received the call from dispatch and there is no indication that additional testimony as to the [o]fficer's observations

9

would change the outcome of [the] suppression hearing." The postconviction court further stated, "Even if Mr. Smith testified and provided an innocent explanation for the furtive movements, it would not change what the officer saw." The postconviction court ultimately found that "[t]here is no reasonable probability that, had additional testimony been received at the motion hearing the result of the proceeding would have been different; furthermore, no prejudice to Mr. Smith has been shown[.]" Thus, the postconviction court found that Smith failed to show that trial counsel was deficient and failed to show that he was prejudiced by counsel's performance.

¶19 Smith now appeals.

## DISCUSSION

¶20 On appeal, Smith renews his argument that he received ineffective assistance of trial counsel during his motion to suppress—specifically he argues that trial counsel was ineffective for failing to call him as a witness and failing to elicit additional testimony from Officer Thompson regarding the stop and search.

¶21 "Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is guaranteed the right to effective assistance of counsel." *State v. Balliette*, 2011 WI 79, ¶21, 336 Wis. 2d 358, 805 N.W.2d 334. A defendant must show two elements to establish that his or her counsel's assistance was constitutionally ineffective: (1) counsel's performance was deficient; and (2) the deficient performance resulted in prejudice to the defense. *Id.* "If the defendant fails to prove either prong, we need not address whether the other prong was satisfied." *State v. Floyd*, 2016 WI App 64, ¶22, 371 Wis. 2d 404, 885 N.W.2d 156.

¶22 "To demonstrate deficient performance, the defendant must show that his counsel's representation 'fell below an objective standard of reasonableness' considering all the circumstances." *State v. Carter*, 2010 WI 40, ¶22, 324 Wis. 2d 640, 782 N.W.2d 695 (citation omitted). "In general, there is a strong presumption that trial counsel's conduct 'falls within the wide range of reasonable professional assistance.'" *State v. Breitzman*, 2017 WI 100, ¶38, 378 Wis. 2d 431, 904 N.W.2d 93 (citation omitted). We also afford "great deference" to trial counsel's strategic decisions. *Id.* (citation omitted).

¶23 Prejudice occurs when counsel's error is of such magnitude that there is a "reasonable probability" that but for the error, the outcome would have been different. *State v. Erickson*, 227 Wis. 2d 758, 769, 596 N.W.2d 749 (1999). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citations omitted).

¶24 "An ineffective assistance of counsel claim presents a mixed question of fact and law." *State v. Pico*, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95. "We will not reverse the circuit court's findings of fact unless they are clearly erroneous." *Id.* "We independently review, as a matter of law, whether those facts demonstrate ineffective assistance of counsel." *Id.*

¶25 Citing to *State v. White*, 2004 WI App 78, 271 Wis. 2d 742, 680 N.W.2d 362, and *State v. Jenkins*, 2014 WI 59, 355 Wis. 2d 180, 848 N.W.2d 786, Smith identifies several reasons why he believes that trial counsel's performance was deficient. First, he argues that trial counsel was deficient for failing to introduce testimony to contradict the officer's testimony regarding the

reasonableness of the stop. Second, Smith argues that trial counsel was deficient for failing to introduce testimony regarding the reasonableness of Officer Thompson's decision to search him. Smith further argues, with regard to the search, that trial counsel was deficient specifically for failing to introduce testimony about Officer Thompson's reliance on the license plates, Smith's movement during the stop, and Smith's evasive answer as a basis for the stop. We disagree that trial counsel was deficient in any of the ways Smith asserts and we address each alleged deficiency below.[7]

¶26    However, we first observe that Smith's arguments that trial counsel failed to elicit additional testimony from Officer Thompson or through Smith himself suffers from two main flaws. First, in the context of determining the reasonableness of a stop and a search, we apply an objective standard based on the officer's perspective. *See State v. Genous*, 2021 WI 50, ¶¶8-10, 397 Wis. 2d 293, 961 N.W.2d 41; *State v. McGill*, 2000 WI 38, ¶¶22-23, 234 Wis. 2d 560, 609 N.W.2d 795. In *Genous*, our supreme court stated:

> Reasonable suspicion must be supported by specific and articulable facts. While it is a low bar, a mere hunch is insufficient. Yet officers are not required to rule out the possibility of innocent behavior before initiating a brief stop. The question is, [w]hat would a reasonable police officer reasonably suspect in light of his or her training and experience? A trained officer draws inferences and makes deductions … that might well elude an untrained person.

*Id*., ¶8 (citations and quotes omitted).

---

[7] The State argues that Smith forfeited several of his arguments related to trial counsel's failure to adequately cross-examine Officer Thompson by failing to raise them below. Despite the State's argument, we address the merits of Smith's claims.

¶27 Second, we must consider the totality of the circumstances in determining whether the decision to stop and search Smith was reasonable. *See Genous*, 397 Wis. 2d 293, ¶9; *McGill*, 234 Wis. 2d 560, ¶23. In *Genous*, our supreme court also stated that "[a] reasonable suspicion determination is based on the totality of the circumstances. We focus not on isolated, independent facts, but on the whole picture viewed together." *Id*., ¶9 (citations and quotes omitted). The *Genous* court further cited to *United States v. Sokolow*, 490 U.S. 1, 9-10 (1989), where the United States Supreme court stated that "[i]ndeed, *Terry*[8] itself involved a series of acts, each of them perhaps innocent if viewed separately, but which taken together warranted further investigation." As stated by the court in *Genous*, "[t]herefore, our task is to consider everything observed by and known to the officer, and then determine whether a reasonable officer in that situation would reasonably suspect that criminal activity was afoot." *Id*., ¶10.

¶28 With these two points in mind, we address Smith's allegations that trial counsel was deficient in failing to elicit certain information from either Smith or Officer Thompson.

*A. Testimony About the Reasonableness of the Stop*

¶29 Smith first argues that the circuit court applied the good faith exception to Officer Thompson's mistake, without key information about Officer Thompson's initial observation of Smith's SUV that should have indicated to the officer that Smith's SUV was not the SUV from the dispatch. Particularly, Smith contends that while he was driving on Oklahoma Ave., he went through a well-lit

---

[8] *Terry v. Ohio*, 392 U.S. 1 (1968).

intersection and he rolled his windows down, allowing Officer Thompson to see inside his vehicle and notice that Smith was the only occupant. He argues that he could have been called to testify regarding the initial encounter and Officer Thompson could have been further questioned about his first observation of Smith's SUV.

¶30 However, by contrast Officer Thompson testified that he did not see the windows down and that he could not see into the SUV because the windows were tinted. Moreover, when the issue of whether the windows were up or down was addressed during the postconviction hearing, the postconviction court stated, "[w]ell, I made a note of that because, in reading the briefs, I wanted to see if that part was clear. And when I saw the video I noticed that only the front window was down and there was dark tint." Thus, the court concluded that the video contradicted Smith's testimony that the windows were down.[9] This court also viewed the video and agrees with the postconviction court that the back windows were up and that the driver's window was only down a couple of inches, but not enough to see into the SUV—this clearly contradicts Smith's testimony that his driver's window was always open. Moreover, when asked if it could affect Smith's credibility if he testified to something that was contrary to what was shown on the body cam video—that the windows were up, not down—trial counsel said that it could have.

¶31 Based on Officer Thompson's testimony and the body cam video, it is clear that he did not see inside Smith's SUV during his encounter with Smith.

---

[9] We note that in making its finding that the windows were up and Officer Thompson could not see into the vehicle, the postconviction court found that Officer Thompson was credible when he testified and Smith was not.

Thus, we conclude that any failure by trial counsel to elicit testimony that Officer Thompson had an opportunity to see inside Smith's SUV was not deficient performance. We also conclude that trial counsel recognized the applicable standard, made a strategic choice in light of that standard, and made a decision to focus on the officer's mistake about the location of the dispatch. *See **Breitzman***, 378 Wis. 2d 431, ¶37.

### B. Testimony About the Reasonableness of the Search

¶32 Smith also argues that trial counsel failed to introduce testimony, through Smith or Officer Thompson, to contradict the reasonableness of the pat-down search. He contends that the circuit court never heard testimony about Smith's gesture towards his vehicle and his evasive answer about what he had in his possession that would have contradicted the officer's testimony. He argues that his testimony would have shown that Officer Thompson lacked articulable facts to support a pat-down search.

¶33 We agree with the postconviction court and the State that trial counsel's performance was not deficient in this regard. Officer Thompson testified that he conducted a pat-down search for weapons for several reasons, namely because he was alone, it was approximately 4:20 a.m., he believed there could be multiple subjects in the vehicle, Smith gestured towards the floorboard of the driver's seat where weapons are typically stored, and Smith answered that he did not know if he had anything in his possession that he was not supposed to have. Because we look to the totality of the circumstances from the officer's perspective, any argument by Smith that his gesture was nothing more than him tossing his keys or that his answer was not meant to hide anything from the officer would not change the court's analysis. *See **Genous***, 397 Wis. 2d 293, ¶¶8-10;

*McGill*, 234 Wis. 2d 560, ¶¶22-23. Furthermore, there is no requirement that Officer Thompson eliminate possible innocent explanations for Smith's behavior. *See Genous*, 397 Wis. 2d 293, ¶8.

¶34 Further, we agree with the postconviction court's conclusion in addressing Smith's argument that he should have been called to testify to explain that his gesture towards the SUV when it stated:

> A review of the body camera video … shows Mr. Smith making movements toward the vehicle after he had stepped out of the car, and Officer Thompson testified at the preliminary [hearing], the motion [hearing], as well as the *Machner* hearing that Mr. Smith reached towards the front driver seat, near the floorboards. Even if Mr. Smith testified and provided an innocent explanation for the furtive movements, it would not change what the officer saw. *Terry*[10] itself recognized that sometimes behavior giving rise to reasonable suspicion is entirely innocent, but it accepted the risk that officers may stop innocent people.

Thus, we conclude that trial counsel was not deficient in not calling Smith to testify about his furtive movement toward the SUV.

### C. Testimony Regarding the License Plates

¶35 Smith next points to trial counsel's failure to show that Officer Thompson did not rely on the results of the license plate search in deciding to search Smith. As the State points out, however, the fact that the license plates on Smith's SUV were registered to a different vehicle more appropriately factors into the reason to stop Smith, not the decision to search Smith. The fact that the license plates were not registered to Smith's SUV is a violation, justifying Officer

---

[10] *Terry*, 392 U.S. 1.

Thompson's decision to stop Smith. *See* **State v. Popke**, 2009 WI 37, ¶13, 317 Wis. 2d 118, 765 N.W.2d 569. Thus, we do not consider trial counsel's performance deficient for failing to elicit additional testimony about the license plates.

### D. Testimony About Smith's Evasive Answer

¶36 Last, Smith argues that trial counsel was deficient for failing to show that Officer Thompson did not rely on Smith's evasive answer to search Smith. Smith also contends that his answer was not evasive and did not indicate that he was armed or dangerous. First, Officer Thompson testified that he did rely in part on Smith's evasive answer in deciding to pat him down. When asked why he patted Smith down Officer Thompson testified as follows:

> Because his answer was evasive saying he didn't know [what] he was supposed to have, because of the fact that I was alone, the fact that he couldn't positively answer if he had anything on him that he wasn't supposed to have, was being evasive about that and the time of day and then I was alone and feared if he had any weapons on him they could have been used against me.

Moreover, as we have previously stated, we must consider the totality of the circumstances from the officer's perspective when analyzing Officer Thompson's actions.

¶37 Additionally, Smith's argument also ignores that Smith was still hiding several things from Officer Thompson—in addition to $173 in cash, Smith also had a firearm, crack cocaine, heroin, ecstasy pills, and three cellphones. Consequently, we do not consider trial counsel deficient for failing to further challenge what Officer Thompson interpreted as an evasive answer from Smith.

¶38 Thus, we conclude that trial counsel's performance was not deficient.[11]

**CONCLUSION**

¶39 For the reasons stated above, we conclude that trial counsel's performance was not deficient, and therefore, trial counsel was not ineffective.[12] Accordingly, we affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[11] Smith argues that the postconviction court erroneously failed to address whether trial counsel's performance was deficient. First, we note that the postconviction court set forth the standard to be applied in determining whether counsel's conduct was deficient and, if so, whether the defendant was prejudiced by that conduct. We conclude that the court's written decision reflects that the court considered both whether counsel's conduct was deficient and whether Smith was prejudiced.

[12] Having established that trial counsel's performance was not deficient we need not address whether Smith was prejudiced. *See Floyd*, 371 Wis. 2d 404, ¶22. Although we need not address prejudice fully, we note that we agree with the postconviction court's conclusion that Smith has not shown that he was prejudiced by counsel's performance.