# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2017AP774-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin, <br>           Plaintiff-Respondent, <br>    v. <br> Courtney C. Brown, <br>           Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 388 Wis. 2d 161,931 N.W.2d 890
PDC No:2019 WI App 34 - Published

| | |
|---|---|
| OPINION FILED: | July 3, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 21, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Fond du Lac |
| JUDGE: | Richard J. Nuss |

JUSTICES:
REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ZIEGLER, and KELLY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion in which KELLY, J., joined. DALLET, J., filed a dissenting opinion.
NOT PARTICIPATING:
ANN WALSH BRADLEY, J., withdrew from participation. BRIAN HAGEDORN, J., did not participate.

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Elizabeth Nash*, assistant state public defender. There was an oral argument by *Elizabeth Nash*.

For the plaintiff-respondent, there was a brief filed by *Michael C. Sanders,* assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Michael C. Sanders*.

An amicus curiae brief was filed on behalf of *The American Civil Liberties Union Foundation of Wisconsin* by *Kendall W. Harrison, Linda S. Schmidt, Maxted M. Lenz,* and *Godfrey & Kahn, S.C.,* Madison. With whom on the brief was *Karyn Rotker* and *ACLU of Wisconsin Foundation*, Milwaukee.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2017AP774-CR
(L.C. No. 2013CF428)

STATE OF WISCONSIN    :    IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent,**

    **v.**

**Courtney C. Brown,**

    **Defendant-Appellant-Petitioner.**

**FILED**

**JUL 3, 2020**

Sheila T. Reiff
Clerk of Supreme Court

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ZIEGLER, and KELLY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion in which KELLY, J., joined. DALLET, J., filed a dissenting opinion.

ANN WALSH BRADLEY, J., withdrew from participation.

BRIAN HAGEDORN, J., did not participate.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 REBECCA GRASSL BRADLEY, J. Courtney Brown failed to fully stop his car at a stop sign, prompting a police officer to initiate a traffic stop. Brown contends the officer impermissibly extended the stop after writing a ticket for the traffic violation by asking Brown to exit the car, inquiring

about anything concerning in Brown's possession, and requesting consent to search him. Brown seeks suppression of the cocaine the officer found in Brown's possession when he searched him, claiming that in the absence of reasonable suspicion, the Fourth Amendment prohibited the officer's actions after he wrote the traffic ticket, which Brown argues should have ended the mission of the stop. We conclude the Constitution permits law enforcement to ask a driver to exit the vehicle, inquire about the presence of weapons, and request consent to search the driver, all of which are negligibly burdensome actions relating to officer safety, a well-established part of a traffic stop's mission.[1] We affirm the court of appeals.

## I.  BACKGROUND

¶2  At about 2:44 a.m. on August 23, 2013, Fond du Lac Police Officer Christopher Deering, while on regular patrol, noticed a car coming from a dead end street containing only closed commercial properties. A record check revealed the car belonged to a car rental company. After observing the car fail to make a complete stop at a stop sign, Deering initiated a traffic stop. He approached the car and observed that the driver, identified as Brown, was not wearing a seatbelt.

---

[1] Because we conclude that the officer did not impermissibly extend the traffic stop, we need not decide whether he had reasonable suspicion to do so. See Gross v. Hoffman, 227 Wis. 296, 300, 277 N.W. 663 (1938) ("As one sufficient ground for support of the judgment has been declared, there is no need to discuss the others urged.").

¶3 Officer Deering asked Brown questions about his whereabouts and destination that evening. Brown stated he was going "nowhere really." Deering learned that Brown was from Milwaukee, which Deering testified was a "source city for drugs" because dealers can sell them at a higher price in the suburbs. Brown told Deering he was visiting a friend in Fond du Lac. Brown claimed to have been at this friend's house before Deering pulled him over, although Brown was unable to provide the last name of the friend or the street address of the house. Brown also indicated that he came directly from Speedway, although Deering had just witnessed Brown come from a dead end street of closed businesses. During Deering's initial encounter with Brown, two other officers arrived on the scene to provide safety assistance, although neither made contact with Brown and remained outside of his car on the passenger side.

¶4 Upon returning to his squad car, Officer Deering wrote Brown a ticket for failing to wear a seat belt. While writing the ticket, Deering ran a records search, which revealed Brown had multiple prior arrests for drug crimes and an armed robbery arrest. Based on Brown's suspicious story and these prior arrests, Deering asked the dispatcher if any canine units were available to perform a dog sniff of Brown's vehicle for drugs. No dogs were available. Deering then re-approached Brown's car with the completed traffic ticket in hand.

¶5 After making contact with Brown for a second time, Officer Deering asked him to step out of the car. Deering led Brown from the driver's side of Brown's car to the front of

3

Deering's squad car. Deering testified he "had [Brown] walk back to [the] squad car." Brown claimed Deering "placed [Brown's] hands behind [his] back and walked [him] to the front of [Deering's] car." Both agreed that Deering did not handcuff Brown while leading him back to Deering's squad car. Deering then asked Brown if there was anything on Brown's person that Deering "needed to know about" or "be concerned about." Deering testified he asked this question to see if Brown "had any illegal weapons or drugs" although he did not subjectively consider the traffic stop to be high-risk and no "specific factors" caused concern that Brown had weapons. Deering testified Brown "could have [had weapons]." Brown answered that he had nothing, but Deering asked for consent to search Brown's person in order to verify Brown's response and then searched him.[2] The search uncovered 13 bindles, or approximately 4 grams, of crack cocaine plus cash over $500. During this exchange and search, Deering remained in possession of the traffic ticket and Brown's driver's license. At no point prior to the search did Deering return these documents or instruct Brown that he was free to leave.

---

[2] The parties dispute whether Brown gave consent. Officer Deering testified that he asked Brown "mind if I search you to double check" and Brown answered "no." Brown testified that Deering asked "could he search me," to which Brown responded "no." The circuit court did not resolve this factual dispute and we conclude it is not necessary to address it. See infra n.8.

4

¶6 The State charged Brown with possession with intent to deliver cocaine as a repeater, in violation of Wis. Stat. § 961.41(1m)(cm)1r (2017-18). Brown moved to suppress the drugs and money found during Deering's search, arguing they were fruits of an unlawful search because Deering's actions unlawfully extended the stop and he lacked reasonable suspicion. The circuit court denied the suppression motion.[3] It found "the scope of the stop and length of the stop were extended due to the officer's suspicions of drug possession or drug activity[,]" but the extension was supported by reasonable suspicion. Brown thereafter pled no contest to one count of possession with intent to deliver cocaine. The circuit court sentenced him to two years of initial confinement and two years of extended supervision.[4] Brown appealed.[5]

¶7 The court of appeals concluded that the officer's requests for Brown to exit the vehicle and consent to search, as well as the search itself, were part of the mission of the traffic stop and not an unlawful extension under the Fourth

[3] The Honorable Dale L. English presided over this hearing.

[4] The Honorable Richard J. Nuss presided over the plea hearing and sentencing, and entered the conviction.

[5] The court of appeals certified the following question to this court: "[A]fter a ticket has been written but before delivery, and in the absence of reasonable suspicion, does asking a lawfully stopped motorist to exit the car, whether he or she possesses anything of concern, and to consent to a search unlawfully extend a traffic stop?" State v. Brown, No. 2017AP774-CR, unpublished slip op., *1 (Wis. Ct. App. Nov. 21, 2018). We declined review. State v. Brown, 2019 WI 21, 385 Wis. 2d 611, 926 N.W.2d 499.

5

Amendment. See State v. Brown, 2019 WI App 34, ¶¶17, 25, 388 Wis. 2d 161, 931 N.W.2d 890. Brown filed a petition for review, which we granted.

## II. STANDARD OF REVIEW

¶8 A party seeking suppression based on a Fourth Amendment violation presents a question of constitutional fact. State v. Smith, 2018 WI 2, ¶9, 379 Wis. 2d 86, 905 N.W.2d 353 (citing State v. Floyd, 2017 WI 78, ¶11, 377 Wis. 2d 394, 898 N.W.2d 560). "We review the circuit court's findings of historical fact under the clearly erroneous standard. But the circuit court's application of the historical facts to constitutional principles is a question of law we review independently." Id. (quoting Floyd, 377 Wis. 2d 394, ¶11).

## III. ANALYSIS

### A. Fourth Amendment General Principles

¶9 The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment is "indispensable to the full enjoyment of the rights of personal security, personal liberty, and private property." 3 J. Story Commentaries on the Constitution of the United States § 1895 (1833). Although many treat the warrant requirement as the heart of the Fourth Amendment's prohibition against searches and

seizures, the Supreme Court repeatedly characterizes the reasonableness of searches and seizures as its "ultimate touchstone." See Riley v. California, 573 U.S. 373, 381 (2014) ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" (quoted source omitted)); Elkins v. United States, 364 U.S. 206, 222 (1960) ("[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.").

¶10 Searches or seizures without a warrant are generally "per se unreasonable under the Fourth Amendment." Arizona v. Gant, 556 U.S. 332, 338 (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). Although the Supreme Court has carved out certain exceptions to the warrant requirement, these exceptions remain subject to the Fourth Amendment's reasonableness requirement. Kentucky v. King, 563 U.S. 452, 459 (2011) (citing Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). One such exception exists for short investigative stops if law enforcement has "a particularized and objective basis" to suspect a person of criminal activity. Navarette v. California, 572 U.S. 393, 396-97 (2014) (quoted source omitted); see also Terry v. Ohio, 392 U.S. 1, 21 (1968) (investigatory stop is reasonable when police have "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"). This exception is well-known as a "Terry" stop and "reasonable suspicion" renders it constitutionally reasonable even without a warrant. See Alabama v. White, 496 U.S. 325, 329-31 (1990); Smith, 379

7

Wis. 2d 86, ¶13. While a traffic stop constitutes a seizure under the Fourth Amendment, it requires only reasonable suspicion of a legal violation. See Rodriguez v. United States, 575 U.S. 348, 354-55 (2015); Floyd, 377 Wis. 2d 394, ¶¶20-21. The reasonable length of a traffic seizure depends on the "mission" of the stop, including law enforcement's "ordinary inquiries" and "related safety concerns." Rodriguez, 575 U.S. at 354; State v. Wright, 2019 WI 45, ¶9, 386 Wis. 2d 495, 926 N.W.2d 157; Smith, 379 Wis. 2d 86, ¶12 (citing Rodriguez, 575 U.S. at 355). A stop's length becomes unreasonable if extended past the point "when tasks tied to the traffic infraction are——or reasonably should have been——completed." Floyd, 377 Wis. 2d 394, ¶21 (quoting Rodriguez, 575 U.S. at 354).

## B. Floyd & Wright

¶11 In State v. Floyd and State v. Wright, we recently addressed constitutional challenges similar to the one Brown presents. These cases control the resolution of Brown's case.

### 1. State v. Floyd

¶12 In Floyd, this court considered "where we draw the line separating traffic stops of acceptable duration from those that have been impermissibly extended." 377 Wis. 2d 394, ¶15. In that case, law enforcement conducted a traffic stop of Lewis Floyd, Jr., and upon initial contact, learned Floyd did not have a driver's license or insurance information. Id., ¶4. The on-scene deputy took Floyd's identification card and returned to his squad car to write a ticket and inquire about available canines; in the interim, another police officer arrived for

8

safety assistance. Id. When the on-scene deputy returned to Floyd's car and while still in possession of Floyd's identification card and completed ticket, the deputy asked Floyd: (1) to exit the car; (2) if he had "any weapons or anything that could harm him"; and (3) if the deputy could search Floyd. Id., ¶5. The deputy found illegal drugs during the search. Id. Floyd moved to suppress the evidence, arguing on appeal that the search occurred after the traffic stop should have been completed. Id., ¶¶7-9, 14. Floyd argued the Constitution's prohibition against unreasonable seizures bars an officer who has completed a traffic ticket from doing anything beyond delivering the ticket and explaining it to the driver. Id., ¶¶16, 25. Because the search of Floyd's person occurred after this point, Floyd argued the stop was impermissibly extended. Id.

¶13 The court explained "an officer is on the proper side of the line so long as the incidents necessary to carry out the purpose of the traffic stop have not been completed, and the officer has not unnecessarily delayed the performance of those incidents." Id., ¶22 (citing Rodriguez, 575 U.S. at 353-55). An officer crosses the line when he continues the traffic seizure "after he has completed all the necessary functions attendant on the traffic stop." Floyd, 377 Wis. 2d 394, ¶22. We then concluded the purpose of the stop included "tak[ing] the time reasonably necessary to draft" the tickets and explain them. Id., ¶23. "Until that is done, and so long as [law enforcement] does not unnecessarily delay the process," the

9

stop's duration remains permissible. Id. We recognized that Supreme Court precedent, as well as our own, rendered the deputy's request to have Floyd exit the vehicle of "no constitutional moment[.]" Id., ¶24 (citation omitted).

¶14 Turning to the search request, Floyd made clear that the mission of a traffic stop includes actions taken pursuant to officer safety, so long as those actions are "negligibly burdensome." Id., ¶¶26-27. Because both questions——whether Floyd had weapons on him and whether the deputy could search to verify their absence——"related to officer safety and were negligibly burdensome," we determined "they were part of the traffic stop's mission, and so did not cause an extension." Id., ¶28 (footnote omitted). Floyd reaffirmed the "request to perform a search of [one's person] was part of the stop's mission." Id., ¶43.

## 2. State v. Wright

¶15 Wright addressed whether law enforcement violated the Fourth Amendment when police officers, without reasonable suspicion of criminal activity: (1) asked about the presence of weapons in the car; (2) asked whether the driver was a concealed carry weapon permit ("CCW") holder; and (3) conducted a CCW check. Wright, 386 Wis. 2d 495, ¶6. In that case, Milwaukee police officers stopped John Patrick Wright for a broken headlight. Id., ¶15. During the stop, an officer asked Wright for his driver's license, whether he had a CCW permit, and whether he had weapons in the car. Id., ¶16. Wright disclosed the existence of a firearm in the glove compartment, which the

10

officers retrieved. Id., ¶17. One of the officers ran a CCW check and discovered Wright did not have a valid permit. Id., ¶18. The officers arrested Wright for unlawfully carrying a concealed weapon. Id. Wright moved to suppress the evidence. Id., ¶19. The circuit court granted Wright's motion, concluding that the questions about having a CCW permit and the presence of weapons impermissibly extended the traffic stop. Id. The court of appeals agreed with the circuit court and affirmed. Id., ¶20.

¶16 On review in this court, we repeated in Wright what we stated in Floyd: a traffic stop's permissible duration depends on the stop's "mission," which includes "(1) addressing the traffic violation that warranted the stop; (2) conducting ordinary inquiries incident to the stop; and (3) taking negligibly burdensome precautions to ensure officer safety." Wright, 386 Wis. 2d 495, ¶¶23-24 (footnotes omitted). We held that a stop is impermissible if it extends past the point when the mission is, "or reasonably should have been, completed." Id., ¶24. We explicitly stated that questions related to an officer's safety "are part of the traffic stop's mission . . . [and] those questions do not cause an extension of the stop." Id., ¶26 (citing Floyd, 377 Wis. 2d 394, ¶28). We noted the Supreme Court "concluded that the Fourth Amendment tolerate[s]" even those investigations unrelated to the stop's mission, "so long as those inquiries do not measurably extend the duration of the stop." Wright, 386 Wis. 2d 495, ¶27; see Illinois v. Caballes, 543 U.S. 405, 407 (2005) ("A seizure that

11

is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

¶17 This court concluded that the question regarding the presence of weapons was "part of the stop's mission because the question [was] a negligibly burdensome precaution taken to ensure officer safety." Wright, 386 Wis. 2d 495, ¶29. "Floyd controls." Id., ¶34. We next determined that the CCW question and permit check were "[i]nquiries unrelated to the original justification for the stop" or officer safety, but were nevertheless "permissible under the Fourth Amendment 'so long as those inquiries [did] not measurably extend the duration of the stop.'" Id., ¶38 (footnote omitted). Applying Caballes and Rodriguez, we concluded neither the CCW question nor the permit check "measurably extended the duration of the traffic stop." Id., ¶¶45, 50.

¶18 In Caballes, the Supreme Court held a dog sniff of a vehicle performed by one officer while another was writing a traffic ticket did not unjustifiably extend the duration of the stop and was constitutionally permissible. See Caballes, 543 U.S. at 406, 408-09. The stop in Caballes was not extended because the "dog sniff occurred while the traffic stop's mission was still being completed." Wright, 386 Wis. 2d 495, ¶40. In contrast, Rodriguez held that a dog sniff performed after law enforcement returned the driver's license and his traffic ticket to the driver violated the Fourth Amendment because it "exceed[ed] the time needed to handle the matter for which the

12

stop was made" and "prolonged beyond the time reasonably required to complete th[e] mission" of the stop. Rodriguez, 575 U.S. at 350-52; see also Wright, 386 Wis. 2d 495, ¶41 ("The Rodriguez Court reached this conclusion because . . . the dog sniff . . . prolonged the stop beyond the time reasonably required to complete the mission of the stop."). The key distinction between Caballes and Rodriguez centered on the timing of the dog sniff. "[I]n Caballes, the dog sniff added no time" to the stop because it "was conducted simultaneously with mission-related activities[,]" whereas "[i]n Rodriguez, all mission-related activities had been completed[.]" Wright, 386 Wis. 2d 495, ¶43.

### C. Application to Brown

¶19 Brown challenges the constitutionality of every action by Officer Deering after he re-approached Brown's vehicle without simply handing the completed seatbelt ticket to Brown. We address each action in turn.

### 1. Asking/Ushering Brown Out of His Vehicle

¶20 First, Officer Deering asked Brown to step out of the vehicle. This action is "of no constitutional moment." See Floyd, 377 Wis. 2d 394, ¶24. When a motorist is "lawfully detained for a traffic violation . . . officers may order the driver to get out of the vehicle without violating the Fourth Amendment[.]" Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977). This is a per se rule allowing officers to order drivers out of the vehicle during a lawful traffic stop. See State v. Johnson, 2007 WI 32, ¶23, 299 Wis. 2d 675, 729

13

N.W.2d 182. In establishing this bright-line rule decades ago, the Supreme Court weighed the "legitimate and weighty" consideration of officer safety as well as "[t]he hazard of accidental injury from passing traffic to an officer standing on the driver's side of the vehicle" against "the intrusion into the driver's personal liberty . . . by the order to get out of the car." Mimms, 434 U.S. at 110-11. Concluding that the latter "hardly rises to the level of a 'petty indignity'" the Supreme Court concluded that "[w]hat is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." Id. at 111 (quoted source and footnote omitted).

¶21 Brown argues Rodriguez narrowed the per se rule of Mimms to allow removal from a vehicle only if attendant to the mission of the stop. Not quite. With respect to Mimms, Rodriguez said only that a dog sniff did not serve the same "highway and officer safety . . . interests" as those justifying ordering the driver to exit the vehicle, while emphasizing that the officer safety interest "stems from the mission of the stop itself." Rodriguez, 575 U.S. at 356-57. As Brown conceded at oral argument, issuing a traffic ticket is part of the traffic stop. At the time Deering directed Brown to exit the vehicle, Deering still had the ticket and Brown's driver's license in his possession, leaving part of the traffic stop's mission uncompleted. See Floyd, 377 Wis. 2d 394, ¶23 ("Until [drafting the tickets and explaining them to the driver] is done, and so long as [law enforcement] does not unnecessarily delay the

14

process, the permissible duration of the traffic stop has not elapsed." (citing Rodriguez, 575 U.S. at 354-55)). Finally, Brown argues the stop "reasonably should have been completed" because Deering had completed writing the ticket, so all that remained was handing the ticket to Brown and ending the seizure. We rejected this argument in Floyd and have no reason to reconsider it. Id., ¶¶25, 28. Because the mission of the stop continued, officer safety remained a viable concern and the per se rule of Mimms fully applies.

2. Walking Brown to the Front of Officer Deering's Squad Car

¶22 We next consider Brown's challenge to the constitutionality of Officer Deering guiding Brown to the front of his squad car. While the parties dispute whether Brown's hands were behind his back during this movement, it is undisputed that Brown was not handcuffed. Deering testified that he "had [Brown] walk back to [his] squad car," while Brown claims Deering "placed [his] hands behind [his] back and walked [him] to the front of [Deering's squad] car." The circuit court did not make any finding regarding this factual dispute, instead noting it was a question of whether one believes Deering or Brown. As the circuit court concluded, this factual determination is irrelevant. Under either scenario, Brown was seized within the meaning of the Fourth Amendment, but the placement of his hands is immaterial to whether the stop was impermissibly extended.

¶23 Officer Deering did not impermissibly extend the stop by moving Brown to the front of his squad car. In determining

15

that law enforcement may request a driver to exit the vehicle during a lawful traffic stop, Mimms recognized the inherent danger of the driver and officer standing a few feet from passing traffic:

> The hazard of accidental injury from passing traffic to an officer standing on the driver's side of the vehicle may also be appreciable in some situations. Rather than conversing while standing exposed to moving traffic, the officer prudently may prefer to ask the driver of the vehicle to step out of the car and off onto the shoulder of the road where the inquiry may be pursued with greater safety to both.

Mimms, 434 U.S. at 111 (emphasis added). In past cases with similar facts, we have never declared any constitutional infirmity with ordering a driver to exit the vehicle during a lawful traffic stop. See Johnson, 299 Wis. 2d 675, ¶¶6, 48 (driver led to the back of his vehicle, then to the curb; court held search of person impermissible on other grounds); State v. Malone, 2004 WI 108, ¶¶7, 47, 274 Wis. 2d 540, 683 N.W.2d 1 (driver asked to step out of the vehicle and led behind it; court held law enforcement conduct reasonable). There is no distinction for Fourth Amendment purposes between law enforcement directing a driver to stand next to his car, at the curb, or behind his car, and leading a driver to the front of the officer's squad car.

3. Asking About Anything on Brown's Person

¶24 While Brown stood in front of the squad car, Officer Deering asked if Brown had anything on his person about which

16

Deering should be concerned.[6] While the parties dispute the exact wording of the question, they agree on the material point: Deering did not specify "weapon" or anything similar. At the suppression hearing, Dearing indicated he asked the question to see if Brown "had any illegal weapons or drugs." Deering did not subjectively believe the stop was high-risk or that a weapon was present.

¶25 Deering's subjective beliefs do not play any role under Fourth Amendment analyses. Under the Fourth Amendment, we review law enforcement actions with an objective lens. See Whren v. United States, 517 U.S. 806, 812-13 (1996) ("Not only have we never held, outside the context of inventory search or administrative inspection . . . , that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary."; "[Our] cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved."; "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

---

[6] The testimony differed as to the exact wording, with Officer Deering testifying he asked if there "was anything on [Brown] I needed to know about," while Brown testified the question was "did [Brown] have anything on [him] that [he] shouldn't have." Brown then clarified the exact question was "did [Brown] have anything that [Deering] should be concerned about." Regardless, the general gist of each variation of the question is the same.

17

¶26 Our inquiry instead examines whether an officer has a constitutionally reasonable safety concern regarding the presence of a weapon after hearing a story inconsistent with the officer's observations, from a driver with prior arrests for drug crimes and armed robbery, who was driving a rental car,[7] and who was unclear about his whereabouts after leaving his residence in a city the officer knew to be a source for drugs. We conclude that he does.

¶27 In Floyd, we said an officer asking whether Floyd "had any weapons or anything that could harm him" was a negligibly burdensome question posed pursuant to officer safety and within the mission of the stop. Floyd, 377 Wis. 2d 394, ¶28; see also Wright, 386 Wis. 2d 495, ¶¶29, 34 (holding the same). Brown argues that the Constitution requires law enforcement to specifically mention "weapons" as the officer did in Floyd. The law generally rejects imposing "magic words" requirements. See State v. Lepsch, 2017 WI 27, ¶36, 374 Wis. 2d 98, 892 N.W.2d 682 (rejecting in the context of a circuit court inquiring about juror bias); Elections Bd. v. Wis. Mfrs. & Commerce, 227 Wis. 2d 650, 654, 669-70, 597 N.W.2d 721 (1999) (rejecting in the context of what is required to be "express advocacy"); see also Patchak v. Zinke, 138 S. Ct. 897, 905 (2018) (noting that the Supreme Court refrains from reading statutes to "incant magic words" (quoted source omitted)).

---

[7] At the suppression hearing, Officer Deering testified that in his experience, drug dealers "often use rental cars."

¶28 We have expressly declined to impose a "magic words" requirement in the Fourth Amendment context as well. See State v. Wantland, 2014 WI 58, ¶33, 355 Wis. 2d 135, 848 N.W.2d 810 (rejecting "particular 'magic words'" in assessing whether consent is withdrawn). Officer Deering testified the reason for this question was to inquire about any possible weapons on Brown's person. During a traffic stop, knowledge of weapons carried by occupants of a vehicle is integral to officer safety. See Wright, 386 Wis. 2d 495, ¶¶25, 29-34 (asking about the presence of weapons is a less burdensome intrusion than other authorized intrusions such as requesting persons out of the vehicle; "traffic stops are 'especially fraught with danger to police officers'" (quoting Michigan v. Long, 463 U.S. 1032, 1047 (1983)). Deering's question was negligibly burdensome and pursuant to the stop's mission because it concerned officer safety.

¶29 The Fourth Amendment allows unrelated investigative inquiries not related to the mission of the stop, provided such inquiries do not "measurably extend the duration of the stop." Wright, 386 Wis. 2d 495, ¶38 (quoted source omitted). Deering's question regarding Brown's possession of any concerning items did not "measurably extend the duration of the stop" because it was posed "concurrently with mission-related activities." See id., ¶¶45, 47, 49, 50 (holding a question about a CCW permit and an ensuing check did not violate the defendant's Fourth Amendment rights because they were done "concurrently with mission-related activities" and did not "measurably extend the

19

duration of the traffic stop"); Floyd, 377 Wis. 2d 394, ¶23 ("Until [drafting the tickets and explaining them to the driver] is done, and so long as [law enforcement] does not unnecessarily delay the process, the permissible duration of the traffic stop has not elapsed." (citing Rodriguez, 575 U.S. at 354-55)).

¶30 Wright and Floyd control; the Constitution does not require law enforcement to use the word "weapon" when asking a driver about his possessions during a traffic stop. Deering's inquiry was part of the stop's mission because it was a "negligibly burdensome precaution[] . . . to complete his mission safely." Rodriguez, 575 U.S. at 357.

### 4. Asking for Consent to Search Brown's Person

¶31 Finally, Brown challenges Officer Deering's request to search Brown's person. As we discussed in Floyd, while a frisk can be a severe intrusion, "a request to conduct such a search cannot." 377 Wis. 2d 394, ¶28. Deering's request for consent to search Brown in order to verify that Brown had no weapons was constitutionally permissible as a negligibly burdensome inquiry related to officer safety.

* * *

¶32 We hold that Officer Deering's actions did not impermissibly extend the stop and were reasonable within the meaning of the Fourth Amendment. Officer Deering's actions and inquiries each related to officer safety, which is part of any stop's mission. At the time Deering undertook them, the mission of the stop had not been completed, nor should it reasonably have been completed because Deering had not issued the seatbelt

20

ticket, explained it, or released Brown from the seizure. See Arizona v. Johnson, 555 U.S. 323, 333 (2009) ("The temporary seizure of [a] driver . . . continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver . . . they are free to leave." (citing Brendlin v. California, 551 U.S. 249, 258 (2007) (discussing law enforcement's control over the stop includes giving permission or indication before one is free to leave and the stop ends))); Floyd, 377 Wis. 2d 394, ¶23 (stop's permissible duration includes drafting and explaining tickets to a driver).

## V. CONCLUSION

¶33 Our determination in this case is governed by Floyd and Wright. We tread no new ground. Consistent with our precedent, and the Supreme Court cases on which those precedents rely, we conclude that Officer Deering did not impermissibly extend Brown's traffic stop beyond constitutional boundaries. Asking Brown to step out of the vehicle, ushering him a few feet away from the road, asking Brown whether he possessed anything that could harm Deering, and requesting consent for a search, were all negligibly burdensome actions directly related to officer safety and therefore part of the stop's mission. Because the mission of the stop had yet to be completed, there

21

was no impermissible extension. The stop and Deering's actions in conducting it were reasonable under the Fourth Amendment.[8]

*By the Court.*—The decision of the court of appeals is affirmed.

¶34 ANN WALSH BRADLEY, J. withdrew from participation.

¶35 BRIAN HAGEDORN, J. did not participate.

---

[8] Brown argues this case should be remanded because there is an unresolved factual issue of consent to Officer Deering's request to search. The circuit court did not decide the consent issue, but assumed Brown consented for the suppression hearing and noted a determination on consent was "an issue for a different day[.]" Brown later pled no contest pursuant to a plea agreement with the State. During the plea hearing, Brown acknowledged that he was giving up certain constitutional rights. At no point did Brown or the circuit court raise the consent issue. Nor did Brown raise the unresolved consent issue in the sentencing hearing.

On appeal, Brown did not make an argument regarding the factual issue of consent to the search until his reply brief. He indicated "suppression issues regarding whether there was consent need to be argued in the trial court if they are to be raised in the appellate court; however, he has not raised said issue on appeal." In a footnote, Brown also indicated "[t]he factual matter whether Brown consented to the search is moot" given his arguments on appeal.

Under the guilty-plea-waiver rule, Brown abandoned the issue of whether he consented to the search. See State v. Kelty, 2006 WI 101, ¶18 294 Wis. 2d 62, 716 N.W.2d 886 ("The general rule is that a guilty, no contest, or Alford plea 'waives all nonjurisdictional defects, including constitutional claims[.]'" (quoted source and footnote omitted)). We also note that Brown abandoned his consent argument in the circuit court. See State v. Woods, 144 Wis. 2d 710, 716, 424 N.W.2d 730 (1988) (explaining that an undecided motion to suppress was abandoned where it was not raised or pursued before final judgment).

22

¶36 REBECCA GRASSL BRADLEY, J. *(concurring).* In his concurrence below, Court of Appeals Judge Paul Reilly asserts that under Wright and Floyd,[1] "our Fourth Amendment protection against warrantless searches and seizures when stopped on the roadway has been eliminated[,]" suggesting that a police officer must have reasonable suspicion that the driver "has committed or is committing an offense" separate from the traffic violation precipitating the stop in order to conduct a search unrelated to the reason for the stop. State v. Brown, 2019 WI App 34, ¶¶26-27, 388 Wis. 2d 161, 931 N.W.2d 890 (Reilly, J., concurring). Justice Rebecca Dallet repeats this error in her dissent, asserting that "ordering Brown out of the vehicle initiated a Terry[2] stop requiring independent reasonable suspicion that criminal activity was in progress." Dissent, ¶55. Judge Reilly's and Justice Dallet's perceptions of Fourth Amendment jurisprudence are unmoored from the Constitution. In Caballes and Johnson,[3] the United States Supreme Court "concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention." Rodriguez v. United States, 575 U.S. 348, 354 (2015). Reasonable suspicion must be

---

[1] See State v. Wright, 2019 WI 45, 386 Wis. 2d 495, 926 N.W.2d 157; State v. Floyd, 2017 WI 78, 377 Wis. 2d 394, 898 N.W.2d 560. Wright was a unanimous decision of this court, authored by Justice Shirley Abrahamson.

[2] Terry v. Ohio, 392 U.S. 1 (1968).

[3] See Illinois v. Caballes, 543 U.S. 405 (2005); Arizona v. Johnson, 555 U.S. 323 (2009).

1

present only if the traffic stop "is prolonged beyond the time reasonably required to complete the mission" of issuing a ticket. Id. at 354-55 (quoted source omitted).

¶37 After misstating the law, Judge Reilly accuses this court of not only approving discriminatory police practices, but also "authorizing and condoning the profiling of persons." See Brown, 388 Wis. 2d 161, ¶32 (Reilly, J., concurring). He suggests that "all persons stopped for a traffic violation should be required to exit their vehicle and be searched so as to eliminate the profiling that is made necessary by the reasoning of Wright and Floyd." Brown, 388 Wis. 2d 161, ¶32 (Reilly, J., concurring). After hyperbolically likening those decisions to Dred Scott,[4] Judge Reilly claims they "continue, albeit implicitly, the bias that not all people are created equal by authorizing police to pick and choose who they will pull from cars for minor traffic violations." Brown, 388 Wis. 2d 161, ¶33 (Reilly, J., concurring). Judge Reilly does not offer any basis for his accusation that law enforcement officers conduct their duties in a biased manner, much less that this court requires them to do so.

¶38 Reasonable judges may disagree about the meaning or application of the law. However, intentionally inciting racial tensions while demeaning the integrity of Wisconsin's highest court erodes public confidence in the judiciary and damages the institution of the court. The Code of Judicial Conduct requires judges to "respect and honor the judicial office as a public

---

[4] Dred Scott v. Sandford, 60 U.S. 393 (1857).

2

trust and strive to enhance and maintain confidence in our legal system" and "uphold the integrity and independence of the judiciary." Code of Judicial Conduct, SCR ch. 60. Suggesting that this court approves discriminatory police practices does not "maintain confidence in our legal system[,]" nor does it "respect and honor the judicial office as a public trust." Id. Rather, such inflammatory rhetoric, particularly with the imprimatur of a published judicial opinion, impugns the integrity and independence of the judiciary.

¶39 Comparing recent decisions of this court to one of the United States Supreme Court's most abhorrent cases also questions the integrity of this court. So too does the suggestion that this court knowingly allows profiling against protected groups of people. The Code of Judicial Conduct requires judges to "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." SCR 60.03(1). Such "attacks unnecessarily tear at the fabric of institutional legitimacy." Chief Justice Patience Roggensack, Tough Talk and the Institutional Legitimacy of Our Courts, Hallows Lecture (Mar. 7, 2017), in Marquette Lawyer, Fall 2017, at 47. "It is a privilege to be a member of the judiciary, but with that privilege comes considerable responsibility. When we speak, . . . we need to choose language that expresses our concerns about court opinions . . . . However, we can do so by choosing language that maintains the institutional legitimacy of our courts[.]" Id. at 51.

¶40 Rather than focusing on the Constitution, Justice Dallet deplores "the real-world consequences" of the court's decision. Dissent, ¶74. Citing nothing but social science research, Justice Dallet posits "[t]he influence of implicit bias is particularly problematic in the policing context" and "'translate[s] most readily into discriminatory behavior'" and "racial profiling" by the police. Dissent, ¶77 (quoted source omitted). Although expressed in less provocative terms than Judge Reilly's concurrence in the court of appeals, Justice Dallet claims "the majority opinion turns a blind eye to the disparities caused by implicit bias." Dissent, ¶78. Considering the consequences of a decision for certain groups of people conflicts with the judicial oath to "administer justice without respect to persons"[5] and inappropriately assumes a role in developing policy more appropriate for the political branches of government than an impartial judiciary tasked with declaring what the law is rather than what it should be. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 353 (2012). Social science research has nothing whatsoever to say about the meaning of the Fourth Amendment or any other provision of the constitution and "cannot form the basis upon which we decide matters of constitutional principle." See Missouri v. Jenkins, 515 U.S. 70, 114, 119-20 (1995) (Thomas, J., concurring).

¶41 The odious outcomes of decisions grounded in social science or majoritarian beliefs should cause jurists to recoil

_____

[5] Wis. Stat. § 757.02.

4

from tethering their opinions to anything but the law. "Historically, when courts contaminate constitutional analysis with then-prevailing notions of" social scientists professing what is "best" for society, the constitutionally-guaranteed rights of the people have been trampled. State v. Roberson, 2019 WI 102, ¶¶84-86, 389 Wis. 2d 190, 935 N.W.2d 813 (Rebecca Grassl Bradley, J., concurring). "Departures from constitutional text have oppressed people under all manner of pernicious pretexts:

> [T]he notion of "social harm" supporting the police power was completely untethered from constitutional text and ripe for misuse in the hands of a Justice such as Holmes, who believed that the Constitution could be reduced to ad hoc balancing. Eugenics was built upon the notion of harm; indeed, it thrived on a sense of imminent doom: that society was degenerating because of what were called its "weaklings" and "discards." The idea that society was being swamped by incompetents was a common trope for eugenicists: the unfit were a "menace." . . . Like the great popular eugenicists of the day, Holmes wrote in Buck[6] that eugenics would prevent society from being "swamped" by incompetents, that fewer criminals would be executed, and that fewer imbeciles would starve.

Victoria Nourse, Buck v. Bell: A Constitutional Tragedy from a Lost World, 39 Pepp. L. Rev. 101, 114-15 (2011) (emphasis added; footnotes omitted)." Roberson, 389 Wis. 2d 190, ¶84 (Rebecca Grassl Bradley, J., concurring).

¶42 In her dissent, Justice Dallet assigns an "important role" to "social science research in guiding the United States Supreme Court to correct course when the law has allowed government infringement of protected civil liberties." Dissent,

---

6 Buck v. Bell, 274 U.S. 200 (1927).

5

¶74 n.7. Social science research should guide policymakers in the legislature. The judiciary's guide should be the law alone. Brown v. Board of Educ., 347 U.S. 483 (1954) was rightly decided because an original understanding of the Fourteenth Amendment's equal protection clause forbids racial segregation, not because psychological studies revealed its damaging effects on school children. See Robert H. Bork, The Tempting of America: The Political Seduction of the Law, 74-83 (1990). It is the Constitution itself, not the application of social science research, that protects the people from violations of their civil rights. "In rebuking his colleagues for upholding segregation, Justice John Marshall Harlan rightly relied solely upon the Constitution:

> But in view of the constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved.

Plessy v. Ferguson, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)." Roberson, 389 Wis. 2d 190, ¶85 (Rebecca Grassl Bradley, J., concurring (emphasis added)).

¶43 More often than not, an opinion dependent upon social science research for its conclusions is written to reach the outcome desired by a majority of justices rather than the result compelled by the Constitution, illustrating "how far beyond any cognizable constitutional principle the Court has reached to

ensure that its own sense of morality and . . . justice pre-empts that of the people and their representatives." Graham v. Florida, 560 U.S. 48, 124 (2010) (Thomas, J., dissenting). For example, in Atkins v. Virginia, 536 U.S. 304 (2002), the United States Supreme Court held that executions of "mentally retarded" criminals were "cruel and unusual punishments" prohibited by "evolving standards of decency" the Court grafted onto the Eighth Amendment. Id. at 321. The Court's conclusion had "no support in the text or history of the Eighth Amendment" and constituted "an opinion of this Court rest[ing] so obviously upon nothing but the personal views of its Members." Id. at 337 (Scalia, J., dissenting). Because the meaning of the Eighth Amendment did not support the Court's preferred outcome, it resorted to relying on the "views of assorted professional and religious organizations, members of the so-called 'world community,' and respondents to opinion polls." Id. at 347, (Scalia, J., dissenting).

¶44 Similarly, in another case cited in Justice Dallet's dissent, "[t]o support its opinion that States should be prohibited from imposing the death penalty on anyone who committed murder before age 18, the Court looks to scientific and sociological studies, picking and choosing those that support its position. It never explains why those particular studies are methodologically sound; none was ever entered into evidence or tested in an adversarial proceeding." Roper v. Simmons, 543 U.S. 551, 616-17 (2005) (Scalia, J., dissenting). Justice Dallet commits the same errors, ostensibly "to

7

illustrate empirically how far our jurisprudence has strayed from the original meaning of the Fourth Amendment." Dissent, ¶74. Conflating correlation and causation, Justice Dallet proceeds to selectively cite a litany of research but neglects to explain how contemporary social science studies could possibly inform the original meaning of the Fourth Amendment.

¶45 Justice Dallet says I "disregard[] the important role of social science research in guiding" judicial decision-making. Dissent, ¶74 n.7. I don't disregard it; I emphatically reject it. Embracing social science research as a methodology of constitutional interpretation is a license for judges to inject their subjective views into opinions rather than applying the law as it is written. A judicial philosophy of interpreting the Constitution to mean whatever a majority of justices wants it to mean renders our supreme law pointless and transforms the judiciary from adjudicators into policymakers. "By what conceivable warrant can nine lawyers presume to be the authoritative conscience of the Nation? The reason for insistence on legislative primacy is obvious and fundamental: '[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.'" Roper, 543 U.S. at 616 (Scalia, J., dissenting) (footnote omitted; formatting altered; quoted sources omitted).

¶46 We should be particularly wary of courts invoking social science research as the basis for judicial opinions because "[d]eplorable decisions such as Plessy v. Ferguson and

8

Buck v. Bell were rooted in evil concepts supported by social science and elitist mores antithetical to the Constitution." Roberson, 389 Wis. 2d 190, ¶86. A faithful application of the Constitution's original meaning "precludes appalling social science-based notions of the day from infecting constitutional analysis. Only the Constitution can serve as a reliable bulwark of the rights and liberty of the people." Id. When applied by courts in the past, theories derived from social science have been fraught with error, at best, and have repeatedly resulted in grave abuses of individual rights and liberty. That reason alone should suffice to persuade jurists to reject social science when interpreting the Constitution.

¶47 Judge Reilly's concurrence in the court of appeals and Justice Dallet's dissent both rest on legal fallacies. Judge Reilly lodges baseless accusations against law enforcement and this court, and Justice Dallet's analysis rests heavily on social science research rather than the actual meaning of the Fourth Amendment. I write separately to underscore the dangers of employing inflammatory rhetoric that erodes the institutional legitimacy of the judiciary and to decry the tainting of constitutional analysis with social science research.

¶48 I am authorized to state that Justice DANIEL KELLY joins this concurrence.

¶49 REBECCA FRANK DALLET, J. *(dissenting).* Officer Christopher Deering could have safely returned Courtney Brown's license and warned him of the need to wear a seat belt, thus completing the remaining tasks tied to a traffic stop made on August 23, 2013. Instead, Officer Deering ordered Brown out of the car for the express purpose of requesting consent to search him for illegal drugs. Because the traffic stop was unreasonably extended without independent reasonable suspicion that a crime had been committed, the subsequent search of Brown's person contravenes the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution.[1] By upholding the constitutionality of this search, the majority sanctions unrestricted officer discretion to prolong a traffic stop in search of other crimes, and turns a blind eye to the discriminatory consequences of unchecked implicit bias. For these reasons, I respectfully dissent.

---

[1] The Fourth Amendment to the United States Constitution reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, Section 11 of the Wisconsin Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

1

I

¶50 The Fourth Amendment's constitutional bar against unreasonable searches and seizures is well understood to defend "against arbitrary invasions by governmental officials," Camara v. Mun. Court of City and Cty. of San Francisco, 387 U.S. 523, 528 (1967), including "arbitrary invasions solely at the unfettered discretion of officers in the field," Brown v. Texas, 443 U.S. 47, 51 (1979). The United States Supreme Court has held that "[t]he essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions . . . ." Delaware v. Prouse, 440 U.S. 648, 653-54 (1979) (footnote and quotation marks omitted) (quoting Marshall v. Barlow's, Inc., 436 U.S. 307, 312 (1978)). The primacy of this guarantee, that government searches and seizures will be judged on their reasonableness, is a longstanding bedrock of constitutional jurisprudence. See Union Pac. R. Co. v. Botsford, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference by others, unless by clear and unquestionable authority of law.").

¶51 The warrantless seizure here is a routine traffic stop, characterized as "a relatively brief encounter . . . more analogous to a so-called Terry stop . . . than to a formal

2

arrest." Knowles v. Iowa, 525 U.S. 113, 117 (1998) (second alteration in original) (internal quotation marks omitted) (quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984)). In Terry, the United States Supreme Court held that officers may conduct a brief investigatory seizure and carefully limited search of a person, a "Terry stop," if the officer has reasonable suspicion that "criminal activity may be afoot."[2] Terry v. Ohio, 392 U.S. 1, 30 (1968). The reasonableness of a Terry stop turns on the "specific and articulable facts" and "rational inferences from those facts," as contrasted with an officer's "inchoate and unparticularized suspicion or hunch." Id. at 20-21, 27.

¶52 While similar to a Terry stop, a traffic stop implicates a distinct body of jurisprudence. Relevant here is the permissible scope and duration of a traffic stop's mission, as well as the tasks the officer may lawfully undertake during that mission. In Rodriguez, the United States Supreme Court established that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' . . . ." Rodriguez v. United States, 575 U.S. 348, 354 (2015). That mission includes: "(1) addressing the traffic violation that warranted the stop; (2) conducting ordinary inquiries incident to the stop; and (3) taking negligibly

---

[2] Terry involved a highly experienced officer whose particularized observations of two men blatantly "casing" a storefront led him to suspect a robbery was imminent and to intervene by seizing and searching them. Terry v. Ohio, 392 U.S. 1, 5-6 (1968).

3

burdensome precautions to ensure officer safety." State v. Wright, 2019 WI 45, ¶24, 386 Wis. 2d 495, 926 N.W.2d 157 (footnotes omitted) (citing Rodriguez, 575 U.S. at 354).

¶53 There are several recognized "negligibly burdensome" measures an officer might take during a traffic stop to address certain safety concerns. In Mimms, the United States Supreme Court held that it is negligibly burdensome for an officer to order the driver out of a vehicle for the duration of the traffic stop. Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977). The Court reasoned that this measure is a de minimis additional intrusion into the driver's personal liberty that would reduce the risk that an officer will be shot or subject to accidental injury from passing traffic. Id. at 110-11. Likewise, this court has concluded that the lesser intrusion of asking about weapons on the driver's person or in the car, or requesting consent to frisk the driver can be permissible safety-related tasks. State v. Floyd, 2017 WI 78, ¶28, 377 Wis. 2d 394, 898 N.W.2d 560.

¶54 The officer's lawful authority for the seizure ends when all mission-related tasks are or "reasonably should have been" completed. Wright, 386 Wis. 2d 495, ¶24 (quoting Rodriguez, 575 U.S. at 354). In other words, the traffic stop ends once an officer "has completed all the necessary functions attendant on the traffic stop." Floyd, 377 Wis. 2d 394, ¶22 (emphasis added) (citing State v. Malone, 2004 WI 108, ¶26, 274 Wis. 2d 540, 683 N.W.2d 1). Whether the traffic stop reasonably should have been completed is assessed based on the totality of

4

the circumstances. Id. (citing United States v. Everett, 601 F.3d 484, 493-94 (6th Cir. 2010)). With these principles in mind, I turn to the circumstances of this traffic stop.

II

¶55 Officer Deering's mission was to address Brown's alleged failure to come to a complete stop at a stop sign. The question is whether, under the totality of the circumstances, Officer Deering reasonably should have completed the stop by returning Brown's license and warning him to wear a seatbelt.[3] See Wright, 386 Wis. 2d 495, ¶24. If the stop reasonably should have been completed, then ordering Brown out of the vehicle initiated a Terry stop requiring independent reasonable suspicion that criminal activity was in progress. Terry, 392 U.S. at 30.

¶56 The majority opinion concludes that Floyd controls on this question. Majority op., ¶21 (citing Floyd, 377 Wis. 2d 394, ¶¶25, 28). Floyd involved a traffic stop for a suspended vehicle registration. Floyd, 377 Wis. 2d 394, ¶2. The officer asked Floyd to exit the vehicle for the purpose of explaining citations for registration, license, and insurance violations, and to prevent Floyd from unlawfully driving away since he did not have a valid license. Id., ¶¶4-5, 7.

---

[3] Wisconsin Stat. § 347.48(2m)(b) prohibits operation of a motor vehicle unless the person is properly restrained in a safety belt. There is no evidence that Officer Deering ever observed Brown operating his vehicle without a seatbelt. In fact, as the majority acknowledges, Officer Deering first noticed Brown was not wearing a seatbelt after Brown's vehicle was stopped. Majority op., ¶2.

5

Remaining at Floyd's vehicle, the officer then inquired about weapons and asked for consent to frisk, which Floyd gave. Id., ¶5. The Floyd court held that the request for consent to frisk did not extend the traffic stop because it was negligibly burdensome and related to one of the ongoing missions of the traffic stop, officer safety. Id., ¶28.

¶57 The majority reads Floyd as a per se rule that the mission of a traffic stop is ongoing until the officer chooses to hand over a traffic ticket or warning, thereby allowing that officer to continue to take all "negligibly burdensome" safety measures. The majority's reading conflicts with recognized Fourth Amendment jurisprudence relied upon in Floyd: "[W]e draw the line between traffic stops of proper duration and those that extend into unconstitutional territory according to functional considerations. We assess those considerations in the context of the 'totality of the circumstances.'" Id., ¶22 (citing Everett, 601 F.3d at 493-94); see also Rodriguez, 575 U.S. at 357 ("The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff 'prolongs'——i.e., adds time to—— 'the stop[.]'" (cross-references omitted)).

¶58 The majority opinion's rejection of a reasonableness test to determine whether the tasks related to the mission should have been completed leaves the duration of a traffic stop, and any subsequent search for officer safety, up to the "arbitrary" and "unfettered discretion of officers in the field." Brown, 443 U.S. at 51. After all, the issuance of a

6

citation or warning is an event wholly controlled by the officer. However, it is this court's job to mitigate arbitrary exercises of police authority by examining whether an officer unnecessarily delayed the process of drafting or explaining any appropriate citations. Floyd, 377 Wis. 2d 394, ¶23. I therefore apply the requisite reasonableness test to the facts of Brown's case and conclude that Officer Deering unreasonably delayed the traffic stop.

¶59 Unlike in Floyd, Brown's seat belt warning required no explanation on how to pay or dispute it, and Officer Deering did not face the additional task of preventing a license-less driver from driving away. Moreover, unlike in Floyd, where the officer asked Floyd out of the vehicle for the purpose of safely explaining a ticket, Officer Deering's testimony and conduct demonstrate that he did not order Brown out of the car based on the safety reasons manufactured by the majority opinion. Majority op., ¶23. Instead, Officer Deering delayed the process of giving Brown a warning in order to investigate his hunch that Brown had committed a drug offense.

¶60 Officer Deering's testimony confirms that he asked Brown out of the vehicle to search him:

Q: Why did you have Mr. Brown exit the vehicle?

A: Again, that would be an awkward encounter to ask for someone's consent when they're sitting in a vehicle and then reach through the window to search them. That's not police practice.

Q: So you already knew you were going to ask to search him before you even re-approached him?

A: Correct.

7

Officer Deering's actions further demonstrate that he delayed giving the warning in order to investigate his hunch that Brown committed a drug offense. First, Officer Deering called for two officers to assist with a mere stop sign violation. Officer Deering further made both a city and county-wide request for a canine to sniff Brown's vehicle for drugs. As Officer Deering later testified:

Q: And why do officers request canines?

A: The canines that us -- or the city and the county have are trained in drug detection. So they can smell the vehicle from the outside and detect any drugs therein.

Q: So you initially had a suspicion of drugs then in the case?

A: Yes.

Q: And that was part of the whole stop to begin with, correct?

A: With everything. His statements and all the totality which we've already gone over.

¶61 Any alleged safety concerns under these circumstances are illusory.[4] Officer Deering maintained this was not a "high-risk" traffic stop and that there were "no specific factors"

---

[4] Escalating the stop by ordering Brown out of the vehicle likely put Officer Deering in a less safe situation than if he had returned Brown's items and the completed warning. See State v. Smith, 2018 WI 2, ¶82, 379 Wis. 2d 86, 905 N.W.2d 353 (Kelly, J., dissenting) ("Is it really necessary to point out that concerns over the officer's safety would vanish if he ended the seizure?"); United States v. Landeros, 913 F.3d 862, 868 (9th Cir. 2019) ("Extending the stop, and thereby prolonging the officers' exposure to Landeros, was, if anything, 'inversely related to officer safety.'" (quoting United States v. Evans, 786 F.3d 779, 787 (9th Cir. 2015))).

8

that led him to conclude Brown had any weapons. When he re-approached the car to give Brown a warning to wear his seatbelt, there were a total of three officers standing outside of Brown's vehicle, two of whom had been continuously watching Brown. At that point any remaining safety concerns could have been dissipated by letting Brown go on his way. The hazard of passing traffic was also not of concern to Officer Deering given the location of the stop and the early morning hour. Cf. Mimms, 434 U.S. at 111. By leading Brown to the squad car and, as Brown testified, "plac[ing] [Brown's] hands behind [his] back," Officer Deering further indicated that a separate investigation was beginning.[5]

¶62 In view of the totality of the circumstances, Officer Deering's decision to order Brown out of the vehicle and walk him back to the squad car "unnecessarily delayed the performance of the incidents" necessary to the traffic stop. Floyd, 377 Wis. 2d 394, ¶22. Consequently, whether Officer Deering had reasonable suspicion for the ensuing Terry stop must be considered.

III

¶63 In order to seize Brown following the reasonable conclusion of the traffic stop, Officer Deering needed reasonable suspicion that criminal activity was in progress

---

[5] Brown testified that as soon as he stepped out of the vehicle, Officer Deering placed Brown's hands behind his back "in a motion like they were handcuffed" and walked him back to the squad car. Officer Deering denied this allegation and testified that he just told Brown to follow him back to the squad car.

9

based upon specific and articulable facts. <u>Terry</u>, 392 U.S. at 21, 30. Under the totality of the circumstances presented by this case, I conclude that Officer Deering's articulated facts were only generalizations or uncorroborated criminal inferences that, even in consideration of Brown's criminal history, did not amount to reasonable suspicion.

¶64 According to Officer Deering's testimony, the following facts led him to reasonably believe a drug violation was in progress:

- Brown drove a rental car which Officer Deering said he knew to be commonly used by drug traffickers;

- Brown resided in Milwaukee, a "source city for drugs";

- The time was 2:44 a.m.;

- Brown was coming from a dead-end street containing closed businesses;

- Brown said he was coming directly from a Speedway gas station, which Officer Deering interpreted as a lie because there was no Speedway down the dead-end street;

- Brown stated he was visiting a recent online acquaintance's residence, offering the cross-streets but not the full address or her last name;

- Brown stated he was not headed anywhere in particular at the time Officer Deering stopped him; and

- Brown had prior drug-related arrests.

¶65 The first three factors sweep in more law-abiding citizens than those who violate the law and should carry little

10

if any weight in an individualized suspicion analysis. According to Officer Deering's testimony, Brown was in a rental car which "people that traffic drugs often use . . . for a variety of reasons." However, the prevailing use of rental cars in Wisconsin is for lawful travel on its roads and highways. See United States v. Williams, 808 F.3d 238, 247 (4th Cir. 2015) ("[T]he Defendants' use of a rental car . . . is of minimal value to the reasonable-suspicion evaluation. . . . [T]he overwhelming majority of rental car drivers on our nation's highways are innocent travelers with entirely legitimate purposes."); United States v. Boyce, 351 F.3d 1102, 1109 (11th Cir. 2003) ("[T]he fact that [the defendant] was driving a rental car on a widely used interstate that also happens to be a known drug corridor, does not create a reasonable suspicion in this case. These factors 'would likely apply to a considerable number of those traveling for perfectly legitimate purposes' and 'do[] not reasonably provide . . . suspicion of criminal activity.'" (second and third alterations in original) (quoting United States v. Smith, 799 F.2d 704, 707 (11th Cir. 1986))).

¶66 As for being a Milwaukeean, this court should not embrace factors that dilute an entire city's Fourth Amendment protections. Officer Deering did not testify to any training or experience as support for his statement that Milwaukee is a "source city for drugs." It is not reasonable to assume that every person who resides in the municipal boundaries of Milwaukee and drives through a different city in Wisconsin is a drug dealer. See United States v. Williams, 271 F.3d 1262, 1270

11

(10th Cir. 2001) ("Standing alone, a vehicle that hails from a purported known drug source area is, at best, a weak factor in finding suspicion of criminal activity.").

¶67 The time of day likewise carries little weight in an individualized suspicion analysis. Officer Deering never explained how the time, 2:44 a.m., particularly connected to drug activity. See United States v. Sigmond-Ballesteros, 285 F.3d 1117, 1125 (9th Cir. 2002) (holding "the time of day has very little, if any, probative value" where there is no proffered evidence that the particular time is connected to the suspected criminal activity). The rental car, Brown's residence in Milwaukee, and the early morning hour contribute little to an analysis of reasonable suspicion.

¶68 Several of the other factors are uncorroborated inferences and similarly offer weak support for reasonable suspicion that criminal activity was in progress. Brown turned from a dead-end street of closed businesses. There was no testimony that this particular street was known to police as a frequent location for drug deals, or that another car or person was observed leaving the area to corroborate a drug transaction, which of course requires more than one person.

¶69 Brown's perceived "lie" about coming directly from a Speedway gas station hinges on Officer Deering's interpretation of the word "directly." According to Officer Deering's testimony, Brown's vehicle was coming from the same direction as the Speedway when Officer Deering first observed it. Brown testified he was going to Speedway when he turned onto the dead-

12

end street to change direction. Brown could have reasonably interpreted Officer Deering's question as asking whether he was coming from the Speedway without making any additional stops.

¶70 Likewise, Brown's response that he did not know the last name or exact street address of an online acquaintance does not suggest criminal activity in progress. Brown lived in Milwaukee and testified that he was unfamiliar with Fond du Lac. It is just as reasonable that he either did not recall or did not want to give officers his acquaintance's full street address or name.

¶71 Lastly, Brown's lack of specific travel plans may have been vague, but they did not conflict with his prior answers such that it corroborated Officer Deering's criminal suspicions. In total, Officer Deering's uncorroborated inferences drawn from Brown's consistent and innocuous responses amounted to nothing more than an insufficient hunch. See Terry, 392 U.S. at 27 ("[D]ue weight must be given, not to [an officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.").

¶72 The most individualized, suggestive evidence of any wrongdoing is a propensity inference from Brown's prior drug-related arrests. But criminal history alone is an insufficient basis for reasonable suspicion:

> Under the Fourth Amendment our society does not allow police officers to round up the usual suspects. An officer relying on his or her knowledge of [an individual's] criminal record is required to pair that knowledge with concrete factors to demonstrate that

13

there [is] a reasonable suspicion of current criminal activity. In other words, knowledge of an individual's criminal history can corroborate[], but not substitute for objective indications of ongoing criminality.

United States v. Castle, 825 F.3d 625, 629 (D.C. Cir. 2016) (alterations in original) (internal quotation marks and quoted sources omitted); see also United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005) ("Even people with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches.").

¶73 Here, Brown's history of prior arrests is not paired with concrete observations of a drug crime. Officer Deering testified that he did not smell drugs or see any physical signs of drug use. See State v. McGill, 2000 WI 38, ¶31, 234 Wis. 2d 560, 609 N.W.2d 795; Malone, 274 Wis. 2d 540, ¶36. There was no testimony regarding Brown being nervous or making any furtive movements. See McGill, 234 Wis. 2d 560, ¶29 (considering overt nervousness); State v. Buchanan, 2011 WI 49, ¶19, 334 Wis. 2d 379, 799 N.W.2d 775 (considering furtive movements). There were no inconsistencies in Brown's responses. Instead, this case involves a criminal history paired with sweeping generalizations and uncorroborated inferences. "Circumstances must not be so general that they risk sweeping into valid law-enforcement concerns persons on whom the requisite individualized suspicion has not focused." State v. Gordon, 2014 WI App 44, ¶12, 353 Wis. 2d 468, 846 N.W.2d 483. I conclude that Officer Deering did not have reasonable suspicion to seize Brown after the reasonable conclusion of the traffic

14

stop and therefore the seizure and subsequent search of Brown were unconstitutional.[6]

IV

¶74 Lastly, in addition to highlighting the majority's disregard of recognized Fourth Amendment jurisprudence and misapplication of Floyd, I must also address one of the real-world consequences of the majority opinion's rejection of the reasonableness inquiry: unchecked implicit bias. I discuss social science research on implicit bias not to depart from constitutional text as the concurrence postulates, but instead to illustrate empirically how far our jurisprudence has strayed from the original meaning of the Fourth Amendment.[7]

---

[6] An unconstitutional seizure taints any evidence recovered during that seizure, even if the search leading to the evidence was conducted upon otherwise valid consent. See United States v. Sandoval, 29 F.3d 537, 544 (10th Cir. 1994) (holding the taint of a driver's unconstitutional seizure invalidates any consent to a search made during that seizure).

[7] Justice Rebecca Grassl Bradley's belief that invoking social science research in judicial decisionmaking leads to violations of civil rights is ironic as it is her majority opinion that broadens government discretion at the expense of individual liberty. Concurrence, ¶¶40-46.

¶75 The concept of implicit bias has been well-researched[8] and can best be described as follows. In order to effectively function in a complex world, the human brain makes associations implicitly, or "outside conscious attentional focus." See Greenwald & Krieger, supra ¶75 n.8, at 947. These associations, which can be beneficial and helpful, also include observations sorted by social categories like race or gender, which in turn trigger implicit stereotypes and attitudes. See id. at 948-952; see also L. Song Richardson, Police Efficiency and the Fourth Amendment, 87 Ind. L.J. 1143, 1147 (2012).

¶76 Problematically, these subconscious stereotypes and attitudes may operate in direct contradiction to one's "consciously and genuinely held thoughts and feelings." L. Song

---

Besides the irony in the concurrence, it disregards the important role of social science research in guiding the United States Supreme Court to correct course when the law has allowed government infringement of protected civil liberties. See State v. Roberson, 2019 WI 102, ¶¶102-03, 389 Wis. 2d 190, 935 N.W.2d 813 (Dallet, J., dissenting) (citing Roper v. Simmons, 543 U.S. 551 (2005); Lawrence v. Texas, 539 U.S. 558 (2003); Atkins v. Virginia, 536 U.S. 304 (2002); and Brown v. Board of Educ., 347 U.S. 483 (1954)). The Constitution was not drafted in a social vacuum, nor does it operate in one. Our decisions interpreting the Constitution have real-world consequences. If social science research can assist this court in assessing how faithfully our decisions protect constitutional rights, then we would only reinforce the institutional legitimacy of the judiciary by taking such research into consideration.

[8] See, e.g., Anthony G. Greenwald & Mahzarin R. Banaji, The Implicit Revolution: Reconceiving the Relation Between Conscious and Unconscious, 72 Am. Psychol. 861 (2017) (synthesizing the significant research efforts and findings in the field of implicit cognition); Anthony G. Greenwald & Linda Hamilton Krieger, Implicit Bias: Scientific Foundations, 94 Cal. L. Rev. 945 (2006).

16

Richardson, Cognitive Bias, Police Character, and the Fourth Amendment, 44 Ariz. St. L.J. 267, 271-72 (citing Jerry Kang & Kristin Lane, A Future History of Implicit Social Cognition and the Law 8 (Aug. 12, 2009) (unpublished manuscript), http://ssrn.com/abstract=1458678); see also Heather M. Kleider et al., Looking Like A Criminal: Stereotypical Black Facial Features Promote Face Source Memory Error, 40 Memory & Cognition 1200, 1204 (2012) ("Overall, these findings support our hypotheses that the association between stereotypical facial features and criminality is likely automatic and/or reflexive, and not reliant on one's individual perceptions of Black men as a whole."). A wealth of data collected by Harvard University's Project Implicit confirms that implicit biases can influence our decisions without any awareness that these biases even exist.[9] https://implicit.harvard.edu/implicit/education.html.

¶77 The influence of implicit bias is particularly problematic in the policing context, where officers are tasked with rapidly judging stressful and potentially dangerous

---

[9] Project Implicit collects this data through its online Implicit Association Tests that measure implicit attitudes across social categories like age, gender, race, and sexuality. See https://implicit.harvard.edu/implicit/takeatest.html; see also Anthony G. Greenwald et al., Understanding and Using the Implicit Association Test: III. Meta-Analysis of Predictive Validity, 97 J. Personality & Soc. Psychol. 17 (2009); Brian A. Nosek, Mahzarin R. Banaji & Anthony G. Greenwald, Harvesting Implicit Group Attitudes and Beliefs from a Demonstration Web Site, 6 Group Dynamics: Theory, Research, & Practice 101 (2002); Anthony G. Greenwald, Debbie E. McGhee & Jordan L.K. Schwartz, Measuring Individual Differences in Implicit Cognition: The Implicit Association Test, 74 J. Personality & Soc. Psychol. 1464 (1998).

situations based upon limited information that is largely ambiguous.[10]  See Richardson, supra ¶76, at 270-71.  Research demonstrates that "[i]mplicit biases translate most readily into discriminatory behavior . . . when people have wide discretion in making quick decisions with little accountability."  Jerry Kang et al., Implicit Bias in the Courtroom, 59 UCLA L. Rev. 1124, 1142 (2012).  Social psychologists have thus come to understand that much of what has been labeled "racial profiling" is likely to instead be spontaneous and unintended.  See Megan Quattlebaum, Let's Get Real:  Behavioral Realism, Implicit Bias,

---

[10] For example, empirical evidence suggests Black and Hispanic drivers are stopped more frequently, for longer, and searched more often than White drivers.  See Sean Hecker, Race and Pretextual Traffic Stops:  An Expanded Role for Civilian Review Board, 28 Colum. Hum. Rts. L. Rev. 551, 558-65 (1997); see also Emma Pierson et al., A Large-scale Analysis of Racial Disparities in Police Stops Across the United States, 4 Nature Human Behaviour (May 4, 2020), https://www.nature.com/articles/s 41562-020-0858-1.pdf.  One explanation is that officers are more likely to infer criminality from a Black driver's ambiguous behavior——like pulling out of a dead-end street——than when a White driver engages in that same ambiguous behavior.  See Richardson, supra ¶75, at 1148-50; see also Jennifer L. Eberhardt et al., Seeing Black:  Race, Crime, and Visual Processing, 87 J. Personality & Soc. Psychol. 876, 883 (2004) (interpreting data showing participants' selective attention more quickly focused on a Black male face when primed to think about crime to mean "[n]ot only are Blacks thought of as criminal, but also crime is thought of as Black.").

I do not intend this dissent to suggest police officers generally, or Officer Deering specifically, act in bad faith or intentionally abuse their discretion to achieve these observed disparities.  After all, "[a]n officer may feel genuinely suspicious, without realizing that those feelings were affected by non-conscious biases and that identical behaviors of a white individual may not have attracted his attention."  Richardson, supra ¶76, at 278.

18

and the Reasonable Police Officer, 14 Stan. J. Civ. Rts. & Civ. Liberties 1, 5 (2018).

¶78 The Terry decision instructs courts to differentiate police hunches based on general, unparticularized information from reasonable inferences based on articulable and specific facts, thereby mitigating the influence of any implicit bias on discretionary searches and seizures. The promised protection of the reasonable suspicion standard, however, has been diluted by this court's growing acceptance of weakly-correlated criminal inferences from generic or generalized factors in direct contrast to the particularized circumstances required under Terry. See Floyd, 377 Wis. 2d 394, ¶¶84-91 (Ann Walsh Bradley, J., dissenting). And now, under the majority's interpretation of Floyd, courts will no longer even reach the question of reasonable suspicion. Police may simply delay issuing a traffic citation until they have exhausted their investigative tools to explore hunches in the name of safety. Without inquiring into the reasonableness of these delays, the duration of a traffic stop falls solely to the unfettered discretion of an officer whose judgments, like all human beings, are susceptible to implicit bias. By disavowing any meaningful review of officer discretion during a traffic stop, the majority opinion turns a blind eye to the disparities caused by implicit bias, despite

the seemingly even-handed promise of the Fourth Amendment and Article I, Section 11 of the Wisconsin Constitution.[11]

¶79 For the foregoing reasons, I respectfully dissent.

_____

[11] The Fourth Amendment sets "the minimal constitutional standards," and this court can and has interpreted Article I, Section 11 of the Wisconsin Constitution to afford greater protections. See State v. Tompkins, 144 Wis. 2d 116, 132, 423 N.W.2d 823 (1988); State v. Eason, 2001 WI 98, ¶60, 245 Wis. 2d 206, 629 N.W.2d 625 ("Indeed, herein, we find that Article I, Section 11 of the Wisconsin Constitution guarantees more protection than the Fourth Amendment provides under the good faith exception as adopted in [United States v. Leon, 468 U.S. 897 (1984)]."). After all, "[i]t is always conceivable that the Supreme Court could interpret the [F]ourth [A]mendment in a way that undermines the protection Wisconsin citizens have from unreasonable searches and seizures under [A]rticle I, [S]ection 11, Wisconsin Constitution." Eason, 245 Wis. 2d 206, ¶60 (quoted source omitted). As the late Justice William J. Brennan, Jr. advocated:

> [T]he decisions of the [United States Supreme] Court are not, and should not be, dispositive of questions regarding rights guaranteed by counterpart provisions of state law. Accordingly, such decisions are not mechanically applicable to state law issues, and state court judges and the members of the bar seriously err if they so treat them. Rather, state court judges, and also practitioners, do well to scrutinize constitutional decisions by federal courts, for only if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, may they properly claim persuasive weight as guideposts when interpreting counterpart state guarantees. I suggest to the bar that, although in the past it might have been safe for counsel to raise only federal constitutional issues in state courts, plainly it would be most unwise these days not also to raise the state constitutional questions.

William J. Brennan, Jr., State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489, 502 (1977) (footnote omitted).